**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**R.W. MEYER, INC.,
Defendant–Appellant.**

**No. 88–2074.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 14, 1989.

Decided Nov. 20, 1989.

**1498**

Thomas J. Gezon, Asst. U.S. Atty., Office of the U.S. Atty., Grand Rapids, Mich., Jacques B. Gelin, Vicki B. Plaut, Sarah P. Robinson (argued), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for U.S.

Jon D. VanderPloeg (argued), Smith, Haughey, Rice & Roegge, Grand Rapids, Mich., for R.W. Meyer, Inc.

Before GUY, BOGGS and NORRIS, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Defendant, R.W. Meyer, Inc. (Meyer), appeals from a district court order granting summary judgment for plaintiff, the United States (hereinafter referred to as the Environmental Protection Agency (EPA) or the government), in this action arising under the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), 42 U.S.C. § 9601, *et seq.* Meyer claims that summary judgment was improper for several reasons. First, it claims that, as a matter of law, the government's indirect costs are not recoverable under CERCLA. Next, it contends that the district court erred in applying retroactively CERCLA's amendments authorizing the award of prejudgment interest. Meyer also claims that the district court erred in finding the defendants jointly and severally liable under CERCLA. Finally, Meyer argues that summary judgment was improper because numerous issues of material fact surrounded the government's claimed direct costs of removal, indirect costs, prejudgment interest, and the issue whether the government's actions were consistent with the National Contingency Plan (NCP), as required under CERCLA. Having determined that the district court's resolution of this matter was correct, we affirm.

The facts underlying this case, as found by the district court, indicate that Meyer owns some property (the property) in a mixed residential, commercial, and industrial setting in Cadillac, Michigan. From 1972 until mid–1981, Meyer leased this property to Northernaire Electroplating Company (Northernaire) to operate an electroplating business. Willard S. Garwood was the president and sole shareholder of Northernaire from 1975 until mid–1981. In the course of its business, Northernaire utilized highly corrosive and caustic substances including cyanide, zinc, hexavalent chromium, cadmium, and chromic acid. In March 1983, officials from the EPA and the Michigan Department of Natural Resources (MDNR) examined the property. Their examination was prompted by earlier reports of MDNR officials indicating that the building had been locked and abandoned and that a child had received chemical burns from playing around discarded drums of electroplating waste that were

left outside the building. State tests on samples of the soil, sludge, and drum contents disclosed the presence of significant amounts of caustic and corrosive materials. During their examination of the site, EPA and MDNR officials observed drums and tanks housing cyanide littered among disarray inside the facility. Based on their observations outside of the building,[1] the officials determined that Northernaire had discharged its electroplating waste into a "catch" basin and that the waste had seeped into the ground from the bottom of the basin. The waste then entered a pipe that drained into a sewer line that discharged into the sewage treatment plant for the city of Cadillac.

Approximately June 28, 1983, EPA officials advised Meyer, Northernaire, and Garwood of their intent to engage in an immediate removal action on the property. Although the EPA advised the defendants that they could conduct the removal action themselves, the defendants declined to do so. Consequently, the EPA, aided by contractors, conducted the removal action from July 5 until August 3, 1983.[2]

After Meyer, Northernaire, and Garwood failed to respond to an August 13, 1984, EPA demand letter seeking payment for the costs of the removal action, the government filed a complaint against them in federal court seeking reimbursement, pursuant to CERCLA. On June 3, 1986, the government filed a motion for partial summary judgment on the issue of the defendants' liability. Following a hearing, the court granted this motion, finding the defendants jointly and severally liable for the government's response costs. *United States v. Northernaire Plating Co.*, 670 F.Supp. 742 (W.D.Mich.1987). The government then filed a motion for summary

judgment on the issue of costs. The government sought $269,811.25 in response costs in addition to prejudgment interest on that amount. The $269,811.25 included $52,978.50 in indirect costs,[3] costs paid to contractors, EPA direct payroll and travel expenses, and $35,473.28 in Department of Justice enforcement costs. This motion also was granted with the exception of $993 incurred for a title search[4] and with the proviso that the parties submit further affidavits regarding the appropriate amount of prejudgment interest. *United States v. Northernaire Plating Co.*, 685 F.Supp. 1410 (W.D.Mich.1988). After the parties stipulated to $74,004.97 as the amount of accumulated prejudgment interest,[5] the court ordered the defendants to pay that amount to the government. On September 2, 1988, the court issued a final judgment on the government's claim. Only Meyer has appealed from that order.

I.

This case comes before us as an appeal from a summary judgment ruling. Our review of such judgments is governed by the principles set forth in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), in which the Supreme Court stated:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact,"

---

1. The EPA and MDNR officials observed soil discoloration indicative of contamination in addition to pipes, an unsealed sewer line, and a "catch" basin open to the ground.

2. The removal action entailed neutralizing the caustic acids and sludges, bulking and shipping the liquid acids, excavating and removing the contaminated sewer line, and decontaminating the interior of the building. The property contained, among other substances, 5,400 gallons of waste cyanide, 140 barrels of waste cyanide mix, 3,450 gallons of acid, and 5,000 gallons of waste hypochlorite solution.

3. As discussed *infra*, this amount represents a reduction from amounts previously sought as indirect costs.

4. After disallowing the $993 for the title search, the court ultimately awarded the government $268,818.25 plus $74,004.97 in prejudgment interest, which totals $342,823.22.

5. In the stipulation, the defendants explicitly preserved their right to appeal the government's entitlement to prejudgment interest.

since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Id.* at 322–23, 106 S.Ct. at 2552 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

The bulk of Meyer's claims concern the extent of its liability under CERCLA for the government's response action. We shall consider these claims first and begin by examining the applicable statutory authority and language.

CERCLA, 42 U.S.C. § 9601, *et. seq.*, was enacted in December 1980 "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R.Rep. No. 1016(I), 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S. CODE CONG. & ADMIN. NEWS 6119, 6125. In *Walls v. Waste Resources Corp.*, 823 F.2d 977 (6th Cir.1987), we noted that CERCLA was intended " 'primarily to facilitate the prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for hazardous wastes.' " *Id.* at 981 (citation omitted).[6] CERCLA was reauthorized and amended in 1986 by SARA, Pub.L. 99–499, 100 Stat. 1613 (1986). CERCLA, when originally enacted, established the Hazardous Substance Response Trust Fund, 42 U.S.C. § 9631, to be utilized in connection with the cleanup of releases of hazardous substances into the environment. Section 9631 was repealed by SARA provisions establishing the Hazardous Substance Superfund (Superfund), 26 U.S.C. § 9507. Among other things, the Superfund finances the government's response to actual or threatened releases of hazardous materials. The Superfund's funding sources include general revenue appropriations, certain environmental taxes, monies recovered under CERCLA on behalf of the Superfund, and CERCLA-authorized penalties and punitive damages.

Section 9604(a) of CERCLA authorizes the President of the United States to respond with "remedial" or other "removal" action against any threatened or actual release of any hazardous substance that may pose an imminent and substantial public health threat.[7] Essentially, Congress has authorized the government to utilize Superfund money to take direct response actions that are consistent with the NCP [8] and to recover *all* response costs from all persons responsible for the release of a hazardous substance. 42 U.S.C. § 9607(a). The recovered funds are used to replenish the Superfund. Section 9607(a) provides, in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

---

**6.** *See generally* Annotation, *Governmental Recovery of Cost of Hazardous Waste Removal Under Comprehensive Environmental Response, Compensation, and Liability Act* (42 U.S.C. §§ 9601, *et seq.*), 70 A.L.R. Fed. 329 (1984 & Supp.1988).

**7.** The President has delegated, in large measure, his authority under CERCLA and SARA to the Administrator of the EPA. *See* Executive Order

No. 12,580, 52 Fed.Reg. 2923 (Jan. 23, 1987), *reprinted in* 42 U.S.C. § 9615 App. at 168–72 (West Supp.1989).

**8.** The National Contingency Plan is described at 42 U.S.C. § 9605 and is set forth at 40 C.F.R. Part 300, *et seq.* That plan sets forth "procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants...." 42 U.S.C. § 9605.

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

As noted, section 9607(a) authorizes the government to recover all costs of removal or remedial response actions. The statute defines remove or removal as follows:

The terms "remove" or "removal" means [sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

42 U.S.C. § 9601(23) (footnote omitted). The action authorized by section 9604(b) that is referenced in the definition of remove or removal includes "such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as [the President] may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter." 42 U.S.C. § 9604(b).

The statute defines remedy as follows:

The terms "remedy" or "remedial action" means [sic] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate, and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite

of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24).

The term respond or response is currently defined as "remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." *Id.* § 9601(25).

The government submitted to the district court extensive documentation supporting its claim that the defendants owe it $234,-337.97 in EPA direct and indirect costs, plus $60,621.99 in prejudgment interest,[9] in addition to $35,473.28 in Department of Justice costs. The requested EPA costs were allocated as follows:

| | | |
|---|---|---|
| $ 22,241.69 | – | EPA payroll |
| 5,974.70 | – | EPA travel |
| 153,143.08 | – | Various contract expenses (including $993 that ultimately was disallowed) |
| 52,978.50 | – | EPA "indirect costs" |
| $234,337.97 | – | (Total) [10] |

Meyer challenges the government's entitlement to recovery of indirect costs under CERCLA, claiming that administrative costs are recoverable only to the extent they are related to a removal action. Meyer concedes that recoverable expenses include "payroll costs and travel expenses of the EPA personnel directly involved with the Northernaire site removal action, and those of the Justice Department attorneys involved in this cost recovery action ... [and] *related* administrative costs, as that right is recognized in reported cases." The gist of Meyer's claim is that the government impermissibly is seeking recovery of indirect administrative costs or other costs inherent in operating the Superfund generally. Meyer claims that these costs are not recoverable because they are unrelated to a given removal action at a given site. It contends that the absence of any reference to indirect costs in the statute and legislative history, in the face of the statute's explicit delineation of recoverable costs, supports its claim that indirect costs are not recoverable.

According to William Cooke, a cost accountant with EPA's Superfund Accounting Branch, the $52,978.50 in indirect costs sought by the government represents real costs that are necessary to operate the Superfund Program and to support cleanup efforts at specific sites, but that cannot be linked directly to the efforts at any one particular site. Cooke indicated that the indirect costs essentially are "overhead costs" attributable to "rent and utilities for site and non-site office space; payroll and benefits for program managers, clerical support and other administrative support staff; and pay earned by on-scene coordinators while on leave, or performing tasks not directly associated with a particular site." Cooke described such costs as inherent in all government grants and contracts and as widely recognized and understood in the business community.[11]

The district court approached the indirect costs issue by examining the statutory definition of response at the time of the removal action and as amended by SARA in 1986. At the time of the removal action, response was defined as "remove, removal, remedy, and remedial action." The 1986 amendment added enforcement activities as recoverable costs. 42 U.S.C. § 9601(25). The issue before the district court became whether Superfund administrative costs are encompassed by the cost of removal or remedial action or enforcement activities

---

9. The amount of prejudgment interest sought subsequently was amended to encompass prejudgment interest at a rate to be determined in the future. The parties ultimately stipulated to $74,004.97 in prejudgment interest.

10. The court's ultimate award of costs totalling $268,818.25 is comprised of $233,344.97 in al-lowed EPA costs plus $35,473.28 in Department of Justice costs.

11. The EPA produced a manual for fiscal years 1983–86 that explains EPA indirect costs and their allocation and that provides instructions to EPA personnel for calculating indirect costs for purposes of CERCLA cost recovery.

contemplated by the statute as recoverable. The district court correctly observed the absence of guidance in the legislative history on this issue. The court recognized existing authority for granting administrative, investigative, and legal expenses associated with the cleanup of a site and with any attendant litigation. *See, e.g., United States v. South Carolina Recycling & Disposal, Inc. (SCRDI)*, 653 F.Supp. 984 (D.S. C.1984) (government permitted to recover litigation costs, including attorney fees, administrative costs, and investigative costs related to cleanup), *aff'd in part, vacated in part and remanded, United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *United States v. Northeastern Pharmaceutical & Chemical Co. (NEPACCO)*, 579 F.Supp. 823 (W.D.Mo.1984) (recoverable costs include "all litigation costs, including attorney fees ... salary and expenses ... associated with ... monitoring, assessing and evaluating the release of contaminants and the taking of actions to prevent, minimize or mitigate damage which might result from a release or threat of release of contaminants"), *id.* at 851–52 (footnote omitted), *aff'd in part, rev'd in part, and remanded*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). The court also noted, however, that neither *SCRDI* nor *NEPACCO* squarely faced the indirect costs question we confront today. In the one case that considered the question, *United States v. Ottati & Goss*, 694 F.Supp. 977 (D.N.H. 1988), the court denied EPA recovery of indirect costs for rent, utilities, supplies, clerical support, and other "overhead" expenses because those costs were deemed necessary to operate the Superfund program generally and could not be attributed directly to a particular site. The district court here, however, found that because the *Ottati & Goss* court offered no additional explanation for its decision to deny recovery of indirect costs, the case was of limited value.

The court concluded that Congress intended that the government recover "*all* of the costs incurred in a remedial or removal action," and that the language of section 9604(b) together "with the broad remedial purpose of CERCLA, supports a liberal interpretation of recoverable costs." *Northernaire*, 685 F.Supp. at 1419. We agree with this interpretation, finding that the challenged indirect costs are part and parcel of all costs of the removal action, which are recoverable under CERCLA.

Contrary to Meyer's assertions, the challenged indirect costs *are* attributable to its cleanup site in that they represent the portion of EPA's overhead expenses that supported the government's response action on Meyer's property.[12] As such, the government's total response costs necessarily include both direct and indirect costs inherent in the cleanup operation. The EPA demonstrated that its indirect costs for such things as office space for EPA employees who oversee response actions represent costs incurred in support of more than one response action and that are apportioned regionally among all the response actions undertaken in a given region. William Cooke described the method of calculating and allocating indirect costs of the Superfund program to a particular response action. Essentially, the EPA determines, for each fiscal year, the total amount of EPA overhead costs at EPA headquarters and the ten regional EPA offices that support CERCLA response actions. EPA allocates part of the headquarters' overhead costs that support response actions to each of its ten regional offices. Those costs are added to each regional office's own overhead costs that support such actions. EPA then calculates an indirect cost rate for each region each fiscal year by dividing the region's total overhead costs attributable to Superfund activities, plus its share of headquarters' overhead costs, by the total number of hours billed by regional Superfund personnel in a given fiscal year. To determine

---

12. Although Meyer claims that EPA's indirect costs are unrelated and unattributable to the government's removal action, the government

affidavits suggesting otherwise were not challenged by affidavit or other evidence offered by Meyer.

what portion of its indirect costs support a particular response action, EPA multiplies the number of hours billed by certain regional personnel to a particular response action by the indirect cost rate for that fiscal year. Finally, to determine the total indirect costs attributable to a particular response site, EPA adds the indirect costs attributed to that site for each year during which response action occurred at that site. According to the government, the $52,-987.50 sought in indirect costs represents the portion of EPA overhead costs attributable to the response action on Meyer's property, which must be added to the government's direct costs to determine the EPA's total cost of the removal action. The use of direct and indirect costs in calculating total cost comports with standard accounting practices [13] and reflects the true overall cost incurred by the government in cleaning up Meyer's property.

Given section 9607(a)'s authorization for the government to recover *all* costs of its removal or remedial actions,[14] we are not persuaded that the government's indirect costs were unauthorized. Rather, to the extent cleanup actions are necessary, we are persuaded that the statute contemplates that those responsible for hazardous waste at each site must bear the *full* cost of cleanup actions and that those costs necessarily include both direct costs and a proportionate share of indirect costs attributable to each site. In essence then, the allocation of the indirect costs to specific cleanup sites effectively renders those costs direct costs attributable to a particular site. We are confident that had Meyer or the other defendants undertaken the

cleanup operation by contracting with another company to perform the cleanup, the costs of that cleanup, whether characterized as costs, direct costs plus indirect costs, or otherwise, would include the type of indirect costs challenged here. The fact that the government's indirect costs may be higher than another entity's does not make those costs any less recoverable, particularly in view of the defendants' failure to handle the cleanup on their own. We are not persuaded that the challenged indirect costs are unrelated or unattributable to the removal action on Meyer's property and conclude that the district court properly found those costs recoverable.

Meyer also claims that, even if the EPA is authorized to recover indirect costs, material issues of fact regarding those costs should have precluded summary judgment. In making this claim, Meyer does not dispute the fact that it offered no opposing affidavits to the government's claim for indirect costs. Rather, Meyer claims that because of changes in the amount of indirect costs sought by the government and because of the complexities involved in calculating such costs, the government failed to sustain its burden of proving the absence of any genuine issues of material fact regarding those costs. The government presented various documents supporting its claim for indirect costs. As previously noted, Cooke's affidavits clearly set out how the EPA indirect costs are calculated. Moreover, Richard Hackley, an accountant for the Superfund, explained the basis for the EPA's reductions in the amount sought as recoverable indirect costs.[15] Although Meyer had ample oppor-

---

**13.** *See* C. HORNGREN & G. FOSTER, COST ACCOUNTING: A MANAGERIAL EMPHASIS 20–36 (6th ed. 1987).

**14.** The district court in *NEPACCO* described recoverable response costs as extremely broad and as including:

    (a) Investigations, monitoring and testing to identify the extent of danger to the public health or welfare or the environment.

    (b) Investigations, monitoring and testing to identify the extent of the release or threatened release of hazardous substances.

    (c) Planning and implementation of a response action.

    (d) Recovery of the costs associated with the above actions, and to enforce the provisions of CERCLA, including the costs incurred for the staffs of the EPA and the Department of Justice.

579 F.Supp. at 850. Arguably, the indirect costs allocated to Meyer represent costs *associated with* the cleanup of Meyer's property.

**15.** Hackley reduced an original figure of $88,-301 in indirect costs to $53,397 to reflect the fact that the EPA no longer included in its calculation of indirect costs hours charged to a particular site by employees of the Office of Regional Counsel, Office of Public Affairs, and the Planning and Management Division. The $53,397

tunity to engage in discovery or otherwise to acquire evidence to support its claim that a genuine issue of material fact existed, it failed to do so. Based on the documents before it, the district court properly determined that no genuine issue of material fact existed regarding indirect costs. Accordingly, summary judgment for the government properly was granted.

## II.

■ We next consider Meyer's claim that the district court erred in applying retroactively the SARA amendment to CERCLA that authorized the government to recover prejudgment interest.[16] This amendment took effect approximately six months prior to the district court's award of prejudgment interest in this case, but after the removal action undertaken by the government and the commencement of this suit. Meyer acknowledges the general rule that a court is obliged to apply the law in effect at the time of its decision, *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), but notes that an exception to the general rule exists when such application would cause manifest injustice or is contrary to statutory authority or legislative history. *Id.* at 711, 94 S.Ct. at 2016. Meyer claims that because the amendment in question explicitly provided for an effective date of October 17, 1986, Congress did not intend the amendment to be applied retroactively. Additionally, Meyer claims that it should have had the opportunity to demonstrate that the amendment's expansion of Meyer's potential liability would result in manifest injustice. Meyer also claims that genuine issues of material fact surrounded the propriety of the prejudgment interest award.

In particular, Meyer claims that because it has not been "recalcitrant, deceptive or unreasonable," *SCRDI*, 653 F.Supp. at 1009, or otherwise delayed the cleanup action or subsequent litigation, the prejudgment interest award was inappropriate.

These claims do not persuade us that the district court erred in awarding the government prejudgment interest. For one, the district court's denial of prejudgment interest in *SCRDI* was vacated in view of SARA's intervening authorization of prejudgment interest. Therefore, the case was remanded for reconsideration of the prejudgment interest issue. *Monsanto*, 858 F.2d at 176. Although it is true that Congress gave no clear indication as to whether SARA should be applied retroactively, we do not view SARA's provisions in isolation. Rather, the legislative history indicates that SARA was intended to "revitalize the Superfund program to permit substantial progress in addressing one of our most pressing environmental problems—the protection of the public from hazardous chemical substances." H.R. Rep. No. 99–253(I), 96th Cong., 2d Sess. 54, *reprinted in* 1986 U.S. CODE CONG. & ADMIN. NEWS 2835, 2836. Moreover, the legislative history to SARA's provisions on liability indicates that the amendments are intended to *clarify* that all response costs are recoverable from responsible parties and notes that section 9607 "gives the [EPA] Administrator authority to obtain prejudgment interest in all cost recovery actions." *Id.* at 73, *reprinted in* 1986 U.S. CODE CONG. & ADMIN. NEWS at 2855. We do not read the statutory or legislative history governing prejudgment interest as evincing congressional intent to postpone its application. *Accord Monsanto*, 858 F.2d at 175 ("the language and legislative

---

subsequently was reduced to $52,978.50 because the former figure was subject to a provisional indirect cost rate while the latter figure reflected the application of the final rate.

16. SARA amended the section 9607(a) provisions on liability to authorize prejudgment interest. The amended provision provides, in pertinent part:

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs

(A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26....

42 U.S.C. § 9607(a).

history of the 1986 amendment [authorizing prejudgment interest] reveal no statutory direction or congressional intent to delay its application").

We also note that in *NEPACCO*, 810 F.2d 726, the retroactivity of CERCLA was considered. The court applied CERCLA retroactively despite CERCLA's proclaimed effective date of December 11, 1980, the alleged absence of language in CERCLA's liability provisions or legislative history supporting retroactive application, or the fact that CERCLA imposed a new kind of liability. The court, noting section 9607's reference to proscribed conduct in the past tense, found that Congress intended CERCLA to apply retroactively despite the absence of express provisions in CERCLA authorizing such application. *See also United States v. Hooker Chemicals & Plastics Corp.*, 680 F.Supp. 546 (W.D.N.Y. 1988) (finding CERCLA retroactive). Because we view SARA as reauthorizing and clarifying the congressional intent underlying CERCLA, because of CERCLA's retroactive application, and because of the broad remedial purposes underlying CERCLA and SARA, we do not believe that Congress would have intended SARA's prejudgment interest provisions only to have prospective effect.[17] The prejudgment interest provisions apply to "[t]he amounts recoverable in an action under this section," 42 U.S.C. § 9607(a), a section that itself has been given effect retroactively. We decline to interpret SARA's effective date as a limitation on its retroactive application. *Accord United States v. Rohm and Haas Co.*, 669 F.Supp. 672 (D.N.J. 1987) (applying SARA's judicial review provisions retroactively). *See also United States v. Shell Oil Co.*, 605 F.Supp. 1064, 1075 (D.Colo.1985) (applying CERCLA retroactively); *NEPACCO*, 810 F.2d 726, 732 (applying CERCLA retroactively).

Finally, Meyer has not indicated, in any way, how retroactive application of the amendment would result in manifest injustice. Therefore, we find no reason for the district court to have deviated from its obligation to apply the law in effect at the time it rendered its decision. We also note that even before SARA expressly authorized it, the district court had discretion to award prejudgment interest. *See NEPACCO*, 579 F.Supp. at 852 (awarding prejudgment interest pre-SARA); *see also SCRDI*, 653 F.Supp. at 1009 (noting that "some CERCLA actions may present circumstances in which an award of prejudgment interest is appropriate," and that absent statutory provision on prejudgment interest, matter is to be resolved by courts). As noted, the district court's ruling denying prejudgment interest in *SCRDI* was vacated and the case was remanded for reconsideration in view of SARA's authorization of recovery of prejudgment interest. In the present case, the district court found that the award was necessary to make the United States whole for interest losses incurred by expenditures from the Superfund to clean up Meyer's property. Finding no errors of law or genuine issues of material fact surrounding the prejudgment interest issue, we conclude that the district court properly granted summary judgment for the government on this issue.

## III.

■ Meyer's claim that the district court erred in finding the defendants jointly and severally liable for the cost of the removal action also fails. In pertinent part, CERCLA provides for liability of the following persons or entities:[18]

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of....

---

**17.** SARA became effective six months prior to the district court's decision. Therefore, SARA can be deemed to have been applied retroactively in this case only if liability determinations occur when a cleanup action has been completed and the cost-recovery suit has commenced.

**18.** Such liability is subject to certain defenses set forth in 42 U.S.C. § 9607(b), which are not applicable here.

42 U.S.C. § 9607(a)(1), (2). Owner or operator is defined, in pertinent part, as "any person owning or operating [an onshore or offshore] facility...." 42 U.S.C. § 9601(20)(A). The term facility is defined, in pertinent part, as:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

*Id.* § 9601(9)(A), (B). The parties do not dispute that Meyer owned the property while Garwood operated the Northernaire electroplating business. The leading case on the issue of joint and several liability under CERCLA is *United States v. Chem-Dyne Corp.*, 572 F.Supp. 802 (S.D. Ohio 1983). *Chem-Dyne* explicitly is recognized and endorsed in the legislative history to SARA regarding CERCLA's liability provisions.[19]

In *Chem-Dyne*, the court noted that although CERCLA does not provide explicitly for joint and several liability of responsible parties, Congress intended for the scope of liability under CERCLA to be determined in accordance with "traditional and evolving principles of common law." *Id.* at 808. As such, the court stated that "where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm," *id.* at 810 (citing RESTATEMENT (SECOND) OF TORTS § 875), and the responsible parties have the burden of proving the divisibility of the harm. *Id.* In accordance with these principles, CERCLA has been interpreted to impose joint and several liability when the environmental harm is indivisible, *see Monsanto*, 858 F.2d at 171–73, and to allow for apportionment when two or more per-

sons independently are responsible for a single harm that is divisible. *Id.* at 171.

■ In this case, the district court made a factual determination that the environmental harm created by the conditions on Meyer's property was indivisible, 670 F.Supp. at 748. We decline to disturb this finding because it is not clearly erroneous. *See Taylor & Gaskin, Inc. v. Chris–Craft Indus.*, 732 F.2d 1273 (6th Cir.1984). The court noted that although the basis for each defendant's liability differed, the harm, *i.e.*, the presence of hazardous materials at the Northernaire facility, was the same. Meyer's liability pursuant to 42 U.S.C. § 9607 was predicated on ownership of the land, notwithstanding the fact that Garwood and Northernaire, as operators of the facility, directly were responsible for the presence of the hazardous substances on Meyer's property. We agree with the district court that CERCLA contemplates strict liability for landowners, who, absent a defense recognized under section 9607(b), are deemed responsible for some of the harm. *See Monsanto*, 858 F.2d at 168 ("The plain language of [section 9607(a)(2)] extends liability to owners of waste facilities regardless of their degree of participation in the subsequent disposal of hazardous waste."); *see also New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985). The district court also noted, however, that CERCLA permits actions for contribution among parties found jointly and severally liable for environmental harm. *Northernaire*, 670 F.Supp. at 748. This observation is supported by the legislative history to SARA, which provides, in pertinent part:

This section clarifies and confirms the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.

**19.** *See* H.R.Rep. No. 99–253(I), 99th Cong., 1st Sess. 74, *reprinted in* 1986 U.S. CODE CONG. & ADMIN. NEWS 2835, 2856 ("nothing in this bill

is intended to change the application of the uniform federal rule of joint and several liability enunciated by the *Chem–Dyne* court").

H.R.Rep. No. 99–253(I), 99th Cong., 2d Sess. 79, *reprinted in* 1986 U.S.CODE CONG. & ADMIN.NEWS 2835, 2861. To the extent that Meyer can demonstrate the divisibility of the harm and that it paid more than its fair share, it will be entitled to relief in its action for contribution currently pending against the other defendants. Accordingly, we conclude that the district court did not err in finding the defendants jointly and severally liable.

## IV.

■ Meyer also urges that genuine issues of material fact existed so as to preclude summary judgment. We already have rejected those arguments with respect to the issues of indirect cost and prejudgment interest. We briefly address Meyer's claim relative to the issues of compliance with the National Contingency Plan and of direct costs.

The government's costs are recoverable to the extent they are not inconsistent with the NCP. 42 U.S.C. § 9607(a)(4). As noted, Meyer bears the burden of demonstrating that the costs sought under CERCLA's liability provisions are inconsistent with the NCP. Section 9605(a)(7) of CERCLA directs that the NCP require remedial action to be cost effective. To prevail on its claim that the EPA's costs were inconsistent with the NCP, Meyer had to demonstrate that the EPA's decision to incur the challenged costs was "arbitrary or capricious." *See NEPACCO*, 810 F.2d at 748. To that end, Meyer claims that a $140,419 cleanup contract awarded to Petrochem without competitive bidding was arbitrary and capricious.

Although 41 U.S.C. § 253 imposes a competitive bidding requirement for federal contracts, section 253(c)(2) establishes an exception for public exigencies. In claiming that the environmental conditions on Meyer's property did not pose a public exigency, Meyer relied on various 1983 government documents indicating that immediate action was not warranted. Those documents indicated that cleanup operations could wait six months because the site did not pose an immediate threat to human health or the environment. The court, in resolving this issue, however, noted additional government affidavits indicating that competitive bidding is a time-consuming process averaging nine to twelve months and that the conditions of various rusted drums containing cyanides and acids on Meyer's property, noted in the 1983 documents, could cause severe injury and death to persons coming in contact with them. Meyer did not respond to or otherwise challenge these factual assertions.

Under these facts, the district court concluded that the EPA did not act arbitrarily and capriciously by electing to forego competitive bidding by characterizing Meyer's property as imminently dangerous. We agree that Meyer failed to demonstrate that the government's actions were inconsistent with the NCP or, otherwise, to raise a genuine issue of material fact regarding the propriety of the government's decision to forego competitive bidding. The fact that a cleanup operation can occur within six months rather than immediately does not render the potential danger from the release of hazardous substance insignificant. Rather, the government must organize its response efforts in accordance with the severity of the danger posed. In any case, it was reasonable for the district court to conclude that, in this case, competitive bidding would have jeopardized the goal of completing the cleanup of Meyer's property within six months.

As for the government's direct costs, we note that rather than offering evidence to counter or otherwise challenge the extensive government documentation of its direct costs, Meyer only raises vague challenges to the validity of those costs based on the government's evidence. In so doing, Meyer has failed to demonstrate a genuine issue of material fact regarding the government's direct costs. Accordingly, summary judgment for the government on this issue also was appropriate.

The district court's judgment is AFFIRMED in all respects.