*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

U.S. BANK NATIONAL ASSOCIATION,
TRUSTEE,

                *Plaintiff-Appellant,*

    *v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY,
                *Defendant-Appellee.*

No. 08-3083

>

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 07-00670—Sandra S. Beckwith, District Judge.

Argued: March 12, 2009

Decided and Filed: April 20, 2009

Before: MARTIN and GILMAN, Circuit Judges; ZOUHARY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Pierre H. Bergeron, SQUIRE, SANDERS & DEMPSEY, L.L.P., Cincinnati, Ohio, for Appellant. Anna T. Katselas, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Pierre H. Bergeron, Thomas D. Amrine, Scott A. Kane, SQUIRE, SANDERS & DEMPSEY, L.L.P., Cincinnati, Ohio, for Appellant. Anna T. Katselas, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

[*] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

---

**OPINION**

---

BOYCE F. MARTIN, JR., Circuit Judge. Eagle-Picher Technologies, LLC[1] ("EP Tech"), an electronics manufacturer, filed for Chapter 11 bankruptcy in 2005. The United States, on behalf of the Environmental Protection Agency and the Department of Interior, filed a claim in the bankruptcy proceeding against EP Tech under "CERCLA"—the Comprehensive Environmental Response, Compensation and Liability Act of 1980. Under CERCLA, the federal government may recover the cost of cleaning up hazardous waste from the parties responsible for its release.

Over the objections of U.S. Bank, the bankruptcy trustee, the bankruptcy court found EP Tech liable for $357,246 of already-incurred costs and $8,735,434 in estimated future costs for the clean-up of groundwater and soil contamination near a now-vacant manufacturing plant in Socorro, New Mexico. U.S. Bank appealed to the district court, which affirmed.

U.S. Bank appeals to this Court, arguing: (i) EP Tech is not liable under CERCLA for hazardous waste releases that occurred before EP Tech acquired an interest in the Socorro plant in 1998; (ii) even if EP Tech is liable for the clean-up costs at the plant, genuine issues of material fact precluded the bankruptcy court from concluding that EP Tech was responsible for contamination detected at a well located a mile and a half south of the plant; and (iii) the bankruptcy court improperly excluded evidence at the hearing on estimating the future cost of cleaning up the hazardous substances. The bankruptcy court's decision was legally correct, and it did not abuse its discretion by excluding evidence of future costs. We AFFIRM.

---

[1] The record alternatively spells this "EaglePicher," "Eagle-Picher," and "Eagle Picher." We will use "EP."

I.

*A.  EP Tech and the Socorro manufacturing plant*

EP Tech was incorporated in 1998.  That year it acquired one of EP Industries, Inc.'s ("EP Inc.'s") internal divisions[2]—the Technologies Division—via an Assignment and Assumption Agreement.  Per this 1998 Agreement, EP Tech acquired: "[a]ll real property and all leasehold interests in real property used in connection with the Business" along with "[a]ll written or oral contracts, agreements or other arrangements relating to the Business."  Among these thirty-seven real property interests was a leasehold interest in "Highway I-25, Exit 152 Socorro, NM 87801 (Vacant Plant)."

As it turned out, the Socorro manufacturing plant had a checkered past when it came to waste disposal.  In 1963, EP Inc. began manufacturing water-activated batteries, printed circuit boards, and cable connectors at the plant, located on about 170 acres due north of Socorro.  The manufacturing process involved trichlorethylene or "TCE"—a cleaner that was discharged into floor drains connected to an onsite sewage lagoon. TCE, according to the World Health Organization, is "probably carcinogenic to humans," and has been designated a hazardous substance for purposes of CERCLA liability.  40 C.F.R. § 302.4.

In 1976 the company stopped its manufacturing operation and deeded the property surrounding the plant back to the city which, from 1977 to 1980, used a portion of the property as a municipal landfill.  But in 1979, the company leased part of the property back from the city and started to manufacture lead-acid batteries at the Socorro plant, a process that generated liquid and solid waste but, according to EP Tech, not TCE waste.  The lease ended in 2000, by which time the plant was no longer in use.

---

[2] According to U.S. Bank, until 1969 this entity was known as "EaglePicher Company" but was later renamed "EaglePicher Incorporated."  We refer to this entity as "EP Inc."

### B.  Hazardous substances in the area

In 1987 a well at the manufacturing plant, the Eagle Picher Municipal Well, tested positive for TCE, and the nearby soil tested positive for lead.  By 1990 TCE was detected in the Olson Well,[3] a municipal well located about a mile and a half south of the Socorro plant.  In response, the EPA and the New Mexico Environment Department began investigating the contamination source.  A 1989 investigation of the landfill concluded that it was not the contamination source.

Despite the TCE detected in both the Olson Well and at the plant, investigations in the 1990s and early 2000s did not find a link between the TCE contamination at the Olson Well and the plant's waste disposal practices.  Notably, in 1996, the New Mexico Environment Department conducted an "Expanded Site Inspection" that involved sampling well-water.  Wells at the plant and the Olson Well tested positive for TCE, but the residential wells in between the two did not.  The investigators reasoned:

> Whether the release to the Olsen Well can be attributed to the Eagle Picher facility is questionable because the Olsen Well is located 1.5 miles from the Eagle Picher facility and because TCE was not detected in the residential wells (Gonzalez and Cotton) located between the Eagle Picher facility and the Olsen Well.  Therefore, the release of TCE and DCE in the Olsen Well is not attributed to the sources on-site at this time.  If more information regarding the sources associated with the release in the Olsen Well is available in the future, attribution of the release shall be reevaluated.

But by the time the United States moved for partial summary judgment in late 2006, a third party, under contract with the U.S. Army Corps, had completed two years of investigating contaminants around Socorro.  The study included drilling new monitoring wells and taking surface water and sediment samples from 2004 through 2006.  Unlike the earlier investigations, this more recent round of tests detected TCE in several private residential wells between the Eagle Picher Municipal Well and the Olson Well.  It led to an April 2007 expanded site inspection and remedial investigation report

---

[3] Sometimes spelled "Olsen Well."  For consistency, we adopt "Olson Well" throughout but do not alter spelling changes in direct quotes.

concluding that TCE "in the Socorro area can be attributable to the former EaglePicher facility . . . ." This report stated that "[e]xisting monitoring wells in the project area indicate that the groundwater gradient is to the south . . . and that a groundwater plume containing chlorinated organic contaminants extends from the former Eagle Pitcher [sic] property to the Olsen well," and "[t]he TCE and other chlorinated organic compound contamination of groundwater in the Socorro area can be attributable to the former Eagle Picher facility based on the historic use and disposal of TCE at the former Eagle Picher facility, the absence of TCE up gradient of the facility, the hydrogeology of the Socorro area, the lack of evidence for other TCE sources, and the characteristics of chlorinated solvents."

In September 2007, the EPA issued a final rule placing the Socorro site on its Superfund National Priorities List—the list of hazardous waste sites designated for priority cleanup. The report describes a large "plume" of TCE-contaminated groundwater approximately two miles long and a quarter-mile wide that extends from the manufacturing plant to an area including the Olson Well.

*C. EP Inc.'s 1991 bankruptcy and settlement agreement*

The bankruptcy at issue here is not the first for the EP businesses. And the Socorro plant is not the only location where an EP entity released hazardous waste. Thus, when EP Inc. filed for Chapter 11 bankruptcy in 1991, the United States filed a claim for the EPA's costs incurred and to be incurred "in the course of responding to releases and threatened releases of hazardous substances into the environment from certain sites. . . ." The United States and EP Inc. executed a settlement agreement in 1996—the "1996 Bankruptcy Settlement Agreement,"—which obligated EP Inc. and "any successor or assign" to be accountable for environmental liabilities at twenty-four sites (not including Socorro) and at "[a]dditional [s]ites." The Socorro site qualifies as an "additional site" because it was not listed as a "liquidated site" or a "debtor-owned site" under the 1996 Bankruptcy Settlement Agreement. The Agreement also specified that payment for environmental response costs at "additional sites" would be subject to

the distribution terms of the bankruptcy reorganization plan—which amounted to a distribution rate of 37%, or $0.37 per $1.00 for general unsecured creditors.

### D.  EP Tech's 2005 bankruptcy

This appeal arises out of EP Tech's 2005 Chapter 11 bankruptcy, filed concurrently with that of its parent corporation, EP Holdings Inc.   Under the reorganization plan, the debtors' assets were transferred to the EP Custodial Trust with U.S. Bank as trustee.  The United States filed a claim on behalf of the EPA and the Department of the Interior against EP Tech seeking to recover the costs for responding to the contamination in the area around the Socorro manufacturing facility, including the Olson Well.  U.S. Bank objected on the ground that EP Tech did not assume liability for hazardous waste releases that occurred before it was incorporated in 1998.  In 2007, the bankruptcy court granted the EPA's motion for partial summary judgment as to EP Tech's liability for response costs, finding that EP Tech assumed, under the 1998 Agreement with EP Inc., all of EP Inc.'s environmental liabilities relating to the Socorro facility.  The bankruptcy court further rejected EP Tech's argument that it was not liable for the contamination at the Olson Well under CERCLA.  The EPA established past costs of $965,530.54, which, at a rate of 37% per the 1996 Bankruptcy Settlement Agreement, amounts to $357,246.

The bankruptcy court held an estimation hearing on EPA's future response costs, which it found amounted to $23.6 million, reduced to 37%, or $8,735,434.  EP Tech appealed this finding to the district court, which affirmed the bankruptcy court's orders. EP Tech now appeals.

## II.

When reviewing a bankruptcy court order on appeal from a decision of a district court, this Court "review[s] the bankruptcy court's order directly and give[s] no deference to the district court's decision." *In re Lee*, 530 F.3d 458, 463 (6th Cir. 2008).

The bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*. *Id.*

III.

### A. The bankruptcy court did not err in concluding that EP Tech assumed its predecessor's environmental liabilities

The parties' threshold disagreement is whether the 1998 Agreement between EP Inc. and EP Tech assigned to EP Tech the liability for all hazardous substance disposal at the Socorro manufacturing facility or only liability arising after the Agreement's execution date—February 24, 1998. The bankruptcy court decided that EP Tech expressly assumed all of EP Inc.'s environmental liabilities, including liability for "additional sites" like Socorro under the 1996 Bankruptcy Settlement Agreement with the EPA. Successor liability under CERCLA is determined by common law contract principles. *Mickowski v. Visi-Trak Worldwide*, 415 F.3d 501, 515 (6th Cir. 2005). Under Ohio law (which the parties agree governs the 1998 Agreement) a buyer of corporate assets is not liable for the debts and obligations of the seller, *Flaugher v. Cone Auto. Mach. Co.*, 507 N.E.2d 331, 334 (Ohio 1987), unless it assumes such liability "expressly or impliedly." *Id.* at 334.

Here, the language of the 1998 Agreement and Assignment undermines U.S. Bank's contention that EP Tech assumed liabilities arising only after the date of execution. The second paragraph of the Agreement states:

> The Assignor has agreed, among other things, to assign to the Assignee all of the Assignor's right, title and interest in the properties, assets (tangible or intangible) and rights (the "Contributed Property") of the Assignor's Technologies Division (the "Business") which are more particularly set forth on Annex A hereto, and the Assignee has agreed that it will accept such assignment and *will assume all of the liabilities and obligations of the Assignor with respect to the Business (collectively, the "Obligations")*;

(emphasis added). The Agreement further describes EP Tech's assumptions in the second numbered paragraph:

2.  The Assignee accepts such assignment, and assumes and *agrees to perform, pay, discharge and comply with all of the covenants, conditions, agreements, terms, obligations and restrictions to be performed or complied with on the part of the Assignor under or in connection with the Business or the Obligations arising from and after the date hereof*, subject to the covenants, conditions, agreements, terms, obligations, restrictions and other provisions set forth in the Contributed Property and the Obligations.

(emphasis added).

U.S. Bank focuses on the phrase, "Obligations arising from and after the date hereof" to argue that EP Tech assumed only post-agreement liabilities. But this reading ignores EP Tech's express assumption of "all of the liabilities and obligations of the Assignor"—defined collectively as "Obligations." In the same sentence that EP Tech agreed to assume "Obligations arising from and after the date hereof," ("Obligations" being a defined term) it also agreed "to perform, pay, discharge and comply with *all* the covenants, conditions, agreements, terms, *obligations* and restrictions to be performed or complied with on the part of the Assignor *under or in connection with the Business . . . .*" (emphasis added). The two clauses are separated by the disjunctive, "or," meaning that the "after the date hereof" language is a separate source of liability from liability for EP Inc.'s "obligations" and "agreements." Indeed, liability under the 1996 Settlement Agreement is an "obligation" "in connection with the Business."

Although the Agreement is not a model of good draftsmanship, EP Tech expressly and separately assumed "all" "obligations" and "agreements" "in connection with the Business"—which includes the 1996 Bankruptcy Settlement Agreement. Thus, the plain and unambiguous language of the 1998 Agreement supports the bankruptcy court's determination that the 1998 Agreement transferred liabilities "in connection with the Business," including those that existed when the Agreement was executed and those "arising from and after" the execution. We conclude therefore that EP Tech assumed CERCLA liability that EP Inc. incurred as an owner or operator of a site at the time of the disposal of hazardous substances. *See* 42 U.S.C. § 9607(a)(2).

### *B. Size of facility and divisibility of harm*

CERCLA establishes strict liability for "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). EP Tech argues that even if it assumed EP Inc.'s liability for hazardous substances disposal at the manufacturing plant, it is not liable for response costs related to hazardous substances at the Olson Well. The company maintains that the Olson Well is a "discrete site" from the manufacturing plant and that a data gap in well-water samples between the plant and the Olson Well leaves open the question of whether there is a single continuous subterranean plume extending from the plant to the Olson Well. This argument requires us to consider whether the contamination at the Olson Well is distinct from the contamination at the manufacturing plant, or whether the contamination can be reasonably apportioned between EP Tech and another party.

Although CERCLA imposes "joint and several" liability on owners and operators of facilities that release hazardous waste, *United States v. Twp. of Brighton* ("*Brighton*"), 153 F.3d 307, 317 (6th Cir. 1998), a party may attempt to limit its CERCLA liability by raising a causation-based argument that the cleanup costs at a single CERCLA facility should be divided between it and another responsible party. *Id.* at 313.[4] The phrase "divisible environmental harm" describes circumstances where CERCLA liability may be apportioned among responsible parties if a potentially responsible party proves that: "(a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." *Id.* at 317-18. The ultimate burden of proving divisibility is on the party invoking the doctrine. *United States v. R.W. Meyer,* 889 F.2d 1497, 1507 (6th Cir. 1988).

---

[4]The harshness of strict and joint and several liability is mitigated by CERCLA's provisions allowing a party who has been sued under Section 107(a) to seek contribution from any other person liable or potentially liable under CERCLA. *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 162 (2004) (describing remedies available under Section 113(f) of CERCLA).

Although other courts have described the divisibility determination as a "question of law" subject to *de novo* review, *e.g., In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 902 (5th Cir. 1993), this Court has (curiously) described the inquiry as a "question of causation," *Brighton*, 153 F.3d. at 318, n.13, subject to reversal only if the determination is "clearly erroneous," even when reached at the summary judgment stage. *R.W. Meyer*, 889 F.2d at 1507.  Notwithstanding *Brighton* and *R.W. Meyer*, we are mindful that here, in reviewing a decision reached at the summary judgment stage, our task is to determine whether genuine issues of material fact preclude a pre-trial ruling on the merits.  *See, e.g.*, *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009).

> *1.  Dr. Rees's report was not properly before the bankruptcy
> court when it ruled on the partial summary judgment motion.*

U.S. Bank argues that the bankruptcy court prematurely decided that the environmental harm near Socorro was not divisible.  As a threshold matter, we must determine the scope of the record before the bankruptcy court when it ruled on the United States's motion for partial summary judgment on liability.  We do so because our role is "to review the case presented . . . rather than a better case fashioned after . . . an unfavorable order."  *See Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005).

U.S. Bank argues that a report prepared by Dr. Todd H. Rees—filed six days *after* the parties fully briefed the partial summary judgment motion, but six days *before* the bankruptcy court ruled on the motion—was part of the record when the bankruptcy court ruled and should have been considered in connection with the liability determination.  As the bankruptcy court explained, however, it did not consider the Rees report "because it believed the motion to be fully briefed as of January 25, 2007, per the agreed scheduling order."  Consistent with this schedule, U.S. Bank made no reference to the Rees report in its brief responding to summary judgment, nor did it otherwise notify the bankruptcy court that the report was relevant to its opposition to summary judgment.  The bankruptcy court therefore properly limited its consideration to the record before it on the briefing deadline because it had no reason to know that U.S. Bank

intended to rely on its later-filed expert report, filed in connection with the future costs estimation hearing, to support its opposition to summary judgment. We thus limit our review of the bankruptcy court's summary judgment ruling to the record as it stood on January 25, 2007—which did not include Rees's expert report.

After the bankruptcy court ruled that the environmental harm around Socorro was indivisible, U.S. Bank asked the bankruptcy court to reconsider in light of the Rees report, which it characterized as "newly discovered evidence." The bankruptcy court declined this request, observing that, "[a] motion to consider newly discovered evidence, even when liberally viewed under Bankruptcy Rule 3008, is not a stopgap for lack of due diligence or for self-made circumstances." We agree. "Reconsideration of a claim that has been previously allowed or disallowed after objection is discretionary with the court." FED. R. BANKR. P. 3008 advisory committee's note. The bankruptcy court did not abuse its discretion by declining to reconsider its earlier divisibility ruling based on Rees's report.

> 2. *No genuine issue of material fact precluded the bankruptcy court from concluding that the environmental harm at the Olson Well was not "distinct" from harm at the manufacturing facility.*

U.S. Bank argues that the bankruptcy court should not have ruled on the question of the divisibility of the environmental damage at the summary judgment stage because U.S. Bank raised a genuine issue of material fact as to whether the harm at the Olson Well was "distinct" from the harm at the manufacturing facility. Under CERCLA, "distinct harms" are "separate injuries." *See* Restatement (Second) of Torts § 433A (1965); *Brighton*, 153 F.3d at 319 ("The proper standards for divisibility come from the Restatement (Second) of Torts[.]"). In *Brighton*, this Court catalogued several "reasonable bases for dividing harm," including "relative toxicity, migratory potential, degree of migration, and synergistic capacities of the hazardous substances." 153 F.3d at 320 (citing *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993)). Other courts have recognized "distinct harms" where a site consists of distinct

subterranean "plumes" of groundwater contamination. *E.g.*, *United States v. Broderick Inv. Co.*, 862 F. Supp. 2d 272, 277 (D. Colo. 1994).

In support of its motion for summary judgment on the issue of liability, the EPA submitted, among other exhibits, a map of the plume, a declaration from Bret Kendrick, EPA's Remedial Project Manager for the Socorro site, and reports from testing for contamination conducted in 2006. Kendrick's declaration stated that, after the earlier inconclusive investigations into the source of TCE contamination at the Olson Well, the EPA and New Mexico Environment Department:

> have investigated and sampled soil and groundwater at numerous locations in the intermediate area between the Eagle Picher Municipal Well and the Olson Well. The results of the investigation indicate that the TCE contamination originates at the former EaglePicher property and that the TCE contamination has migrated south to at least the Olson Well.

Kendrick also stated that "no source area of TCE release has been identified within the area of the plume other than at the EaglePicher property." He interpreted the available data to indicate that the TCE contamination migrated from the manufacturing plant at least as far south as the Olson Well. In opposing summary judgment, U.S. Bank stated that "it appears that there may be reasonable and rational chronological and volumetric reasons for apportioning the contribution of causes for soil and groundwater contamination by the primary contaminants of concern, TCE and lead, over periods of time and between numerous operators." But it did not timely offer evidence to support its allegation that the contamination at the Olson Well was distinct from the contamination at the manufacturing facility.

U.S. Bank relied on one of the *Brighton* bases for divisibility, ("relative toxicity") to argue that disparities in TCE levels at the Olson Well and at the plant undermined the EPA's assertion that there was a continuous indivisible plume extending from the plant to the Olson Well. But the evidence it offered was insufficient to create a genuine issue of material fact because the evidence was limited to a quote from the Socorro City Clerk, contained in the local newspaper that "Recent tests of Eagle Picher Well showed no TCE." Yet U.S. Bank made no effort to reconcile this unsupported

quote with the 2006 sampling data that the United States submitted to support its motion for summary judgment. U.S. Bank also cited to the 1996 expanded site investigation that concluded that the TCE groundwater at the Olson Well could not be connected to EP Inc. "at [that] time." But it ignored Kendrick's declaration describing how more recent groundwater sampling showed that contamination extended south from EP Tech's property. Without more, no reasonable fact-finder could have concluded that the contamination at the Olson Well was "distinct" from the contamination at the plant.

>    *3. No genuine issue of material fact precluded the bankruptcy court from concluding that there was no "reasonable basis for determining the contribution of each cause to a single harm."*

The *Brighton* court also recognized that in some situations even a single harm may be apportioned where there is a "reasonable basis for determining the contribution" of multiple causes. 153 F.3d at 318. It acknowledged that "we cannot define for all time what is a reasonable basis for divisibility and what is not," *id.* at 319, but made clear that "unlike comparative negligence, divisibility analysis is not an invitation to courts to attempt to 'split the difference.'" *Id.* Thus, courts should impose joint and several liability "unless they have a reasonable basis for dividing causation." *Id.*

Here, besides the untimely Rees report, there was no evidence to suggest a "reasonable basis" for apportioning liability between EP Tech and an unknown second source. The allegation that a jewelry company may have used the manufacturing facility in 1979 and may have released TCE was, standing alone, insufficient to demonstrate a genuine issue of material fact as to whether there was a "reasonable basis" for apportionment. And U.S. Bank's contention that there is a basis for chronological divisibility between it and its predecessor, EP Inc. also fails because, as discussed in Section I above, EP Tech expressly assumed liability for EP Inc.'s obligations, including its environmental liabilities. Thus, even if it could show that EP Inc.'s pre-1998 hazardous releases provide a reasonable basis for apportionment, EP Tech expressly assumed liability for those obligations when it executed the 1998 Agreement.

In sum, at the summary judgment stage, U.S. Bank failed to introduce evidence sufficient to create a genuine issue of material fact as to whether the harm at the Olson Well is "distinct" from that at the manufacturing facility or whether there is a "reasonable basis" for apportioning liability between it and another party. The bankruptcy court therefore properly entered summary judgment in the United States's favor with respect to CERCLA liability.

*C. The bankruptcy court did not abuse its discretion by excluding certain evidence.*

Finally, U.S. Bank argues that at the estimation hearing on future clean-up costs at the Socorro site, the bankruptcy court erred in blocking cross-examination of the EPA's expert about the source of contamination. U.S. Bank says the bankruptcy court also erred by preventing U.S. Bank's expert (Dr. Rees) from testifying about the directional flow of groundwater and about the presence of contaminants at the Olson Well that are not located at the manufacturing facility. We review a bankruptcy court's evidentiary admissions or exclusions for abuse of discretion. *In re Barrett*, 487 F.3d 353, 362 (6th Cir. 2007). In determining future costs, the bankruptcy court retained wide discretion to admit or exclude evidence. *Id.* In a claim-estimation hearing, the bankruptcy court's task is to "arrive at a reasonable estimate of the probable value of the claim"—not a mathematical certainty. *In re Baldwin-United Corp.*, 55 BR. 885, 889 (Bankr. S.D. Ohio 1985).

The difference between the parties' future cost estimates stemmed from the number of proposed extraction wells; the EPA's expert proposed four, and U.S. Bank's expert opined that one would be sufficient. At the hearing, the bankruptcy court heard testimony from both experts (Kendrick and Rees), as well as from the EPA's rebuttal witness, Dr. Allen Medine.

As the bankruptcy court observed, there is considerable overlap between the causation-based divisibility issue that it decided at the summary judgment stage and evidence relevant to estimating the cost of cleaning up the area. Indeed, in its written order the bankruptcy court acknowledged the "procedural peculiarity" resulting from the

fact that Rees's expert report discussing "groundwater flow in great detail" was admitted for the first time at the estimation hearing, after the issue of EP Tech's liability for the entire plume was already determined.

Our review of the hearing transcript indicates, contrary to U.S. Bank's characterization, that the bankruptcy court was well-aware that, notwithstanding the finality of the divisibility issue, U.S. Bank was allowed to challenge the estimate derived from EPA's proposed clean-up strategy. And the transcript shows that the court gave both parties wide latitude. The court appreciated the overlap between the divisibility issue and the estimation of future costs, allowing, over the EPA's objections, several questions that touched on divisibility because "they may have some relevance beyond that." It did not categorically bar questions about the scope of the contamination, and instead probed each of the experts on how their proposed clean-up plans fit with the available data. And even if Rees's opinion as to where the groundwater flowed retained independent relevance to the question of how best to clean up the site, the bankruptcy court admitted his entire report, which contained his opinions on groundwater flow and contaminants at the Olson Well.

We thus conclude that the bankruptcy court did not abuse its discretion. Nor has U.S. Bank demonstrated that the exclusion of relevant evidence resulted in substantial injustice. *See, e.g.*, *United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1029 (6th Cir. 2003).

## IV.

For the reasons explained above, we AFFIRM.