**PNEUMO ABEX CORPORATION, et al., Plaintiffs,**

v.

**BESSEMER AND LAKE ERIE RAILROAD COMPANY, INC., et al., Defendants.**

**Civil Action No. 2:94cv716.**

United States District Court, E.D. Virginia, Norfolk Division.

Sept. 12, 1996.

James A. Gorry, III, Taylor & Walker, P.C., Norfolk, VA, Joseph G. Homsy, John W. Roberts, Lea D. Leadbeater, Albert J. Birkbeck, Zevnik Horton Guibord & McGovern, P.C., Chicago, IL, for Pneumo Abex Corporation, Whitman Corporation.

Nancy Bennett Cherry, George Manuel Willson, City Attorney's Office, Portsmouth, VA, for City of Portsmouth, Virginia,

Joseph Price Massey, Susan Taylor Hansen, Katherine Susan Cross, Cooper, Spong & Davis, Portsmouth, VA, for Portsmouth Redevelopment and Housing Authority.

Michael Henry Wojcik, Weinberg & Stein, Norfolk, VA, Louis A. Naugle, James Mizgala, Reed Smith Shaw & McClay, Pittsburgh, PA, Jennifer Sarah Blank, Reed Smith Shaw & McClay, Washington, DC, for Bessemer and Lake Erie Railroad Company, Inc., Union Railroad Co., Inc.

Thomas Scott McGraw, Faggert & Frieden, P.C., Chesapeake, VA, David Charles Bowen, Willcox & Savage, Norfolk, VA, Rodney B. Griffith, Consolidated Rail Corporation, Philadelphia, PA, for Consolidated Rail Corporation.

Robert H. Cox, Kevin A. Gaynor, George C. Hopkins, Vinson & Elkins, L.L.P., Washington, DC, for CSX Transportation, Inc., Fruit Growers Express Company, Inc.

Michael Dale Beverly, Joseph Marvin Spivey, III, Hunton & Williams, Richmond, VA, Frederick Blair Wimbish, Norfolk Southern Corporation, Law Department, Norfolk, VA, for Norfolk Southern Railway Co., Norfolk & Western Railway Co.

Mary Metil Grove, Christian, Barton, Epps, Brent and Chappell, Richmond, VA, Richard A. Porach, Pittsburgh, PA, for Pittsburgh & Lake Erie Railroad Company, Inc.

Channing Joseph Martin, William Rutherford Mauck, Jr., Heidi Abbott, Williams, Mullen, Christian & Dobbins, Richmond, VA, for Richmond, Fredericksburg & Potomac Railroad Co., Inc.

## MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

### INTRODUCTION

Plaintiffs initiated this action in 1994 pursuant to sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9607, 9613 (1994), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA" or "the Act"), and the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (1994). Plaintiffs seek recovery of costs allegedly incurred in responding to releases or threatened releases of hazardous substances at or from the Pneumo Abex Superfund Site ("Site") in Portsmouth, Virginia. Plaintiffs also seek a declaratory judgment that Defendants are liable for the costs of implementing the permanent remedy at the Site. The Site, designated by the United States Environmental Protection Agency (the "EPA") as Operable Unit 1 ("OU1"), is the area within a radius of 700 feet of Pneumo Abex Corporation's ("Pneumo Abex") former foundry, and is divided into four quadrants.

By order filed March 25, 1996, the Court found the Railroad Defendants remaining in the litigation and Consolidated Rail Corporation liable as generators under § 107(a) of CERCLA. The Court also dismissed Plaintiffs' claims under § 113 of CERCLA as unnecessary because the Court had ruled that they could proceed under § 107 even though they are potentially responsible parties ("PRPs"). The Court held a six-day bench trial to determine the allocation of liability among the parties. The parties filed post-trial briefs, as directed, on June 12, 1996. This matter is now ripe for judicial determination.

### I. FACTUAL BACKGROUND

Plaintiffs Pneumo Abex, the City of Portsmouth (the "City"), and the Portsmouth Redevelopment and Housing Authority (the "PRHA") own property within the Site. Plaintiff Whitman Corporation is the former parent company of Abex Corporation, the predecessor of Pneumo Abex. Whitman Corporation has been reimbursing Pneumo Abex for its environmental liability since

Whitman Corporation sold Pneumo Abex in 1988. (R. at 230–31.) Most of the Defendants in this case were customers of Pneumo Abex's foundry in Portsmouth, Virginia ("Defendants I") and sent worn journal bearings to the foundry to be "converted" into new journal bearings. (See March 25, 1996 Memorandum Opinion and Order, 921 F.Supp. 336 for further explanation.) Plaintiffs also sued Defendants Holland Investment and Manufacturing Company, Inc., John C. Holland, Jr., and Runnymede Corporation (collectively known as "the Landowner Defendants") as landowners within the Site.

According to the EPA, response activity began at the Site in 1986 when the EPA identified high lead concentrations. (Record of Decision Amendment, prepared by the United States Environmental Protection Agency, August 1994 [hereinafter ROD Amend.] at 2.) Pursuant to the Consent Order of August, 1986, Pneumo Abex excavated and removed contaminated soil at the Site. (*Id.*) In October of 1989, Pneumo Abex entered into an administrative order on consent with the Virginia Department of Waste Management ("VDWM") to perform the Remedial Investigation/Feasibility Study ("RI/FS") under the VDWM's supervision. (Stip. ¶ 23.) Pneumo Abex completed the RI/FS and submitted the final report to the VDWM in February of 1992. (Stip. ¶ 24.) Pursuant to the EPA's unilateral administrative order of March, 1992, Pneumo Abex excavated and removed additional contaminated soil. (ROD Amend. at 2.) However, Pneumo Abex did not complete the excavation and removal of contaminated surface soil because some residents wished to remain in place for the long-term remediation. In September of 1992, the EPA and the Commonwealth of Virginia published a Record of Decision ("1992 ROD") with the final remedy. (*Id.*) On October 19, 1993, Pneumo Abex submitted proposed changes to the 1992 ROD based upon new information from the City on proposed plans for zoning and land-use, as well as new institutional controls on future excavation within the Site. (*Id.* at 2–

3.) The EPA subsequently amended the 1992 ROD and published in August of 1994 the Record of Decision Amendment ("Amended ROD"). In December of 1995, the EPA issued the Explanation of Significant Differences ("ESD") which again revised the permanent remedy. (Pls.' Br. at 10.)

In January, 1993 and December, 1994, during these removal activities, the EPA notified, *inter alia*, Defendants I and Plaintiffs that they were PRPs under § 107(a), (Stip. ¶¶ 29, 30), and invited them to negotiate a consent decree.[1] Plaintiffs were the only parties to negotiate a consent decree with the United States. In a separate action, the United States and Plaintiffs herein lodged the Consent Decree with the Court on March 4, 1996, and the Court entered it on April 25, 1996. *United States v. Pneumo Abex Corp.,* Civ.A. No. 2:96cv27 (E.D.Va.).

On May 6, 1996, the EPA issued a unilateral administrative order pursuant to § 106(a) of CERCLA to Defendants I. (Pls.' Ex. 446; R. at 508–09, 533–34.) The order requires Defendants I to contribute to the permanent remedy at the Site. Section 106(a) of CERCLA allows for the issuance of an order when "there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." CERCLA § 106(a). The Court has jurisdiction to grant relief "as the public interest and the equities of the case may require." *Id.* Furthermore, § 106 provides that

> any person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order … under subsection (a) of this section may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues.

---

1. Defendants remaining in the litigation adduced testimony to suggest that the EPA never "invited" them to enter into a consent decree. (R. at 504–07.) As the Court explains below in its

discussion of Plaintiffs' Share and Defendants' Share, the explanation proffered for Defendants' failure to enter into a consent decree is unpersuasive.

CERCLA § 106(b)(1). To date, the EPA has not petitioned the Court to enforce the order.

Subsequent to the Court's ruling of March 25, 1996 concerning liability, Plaintiffs and a number of Defendants entered into settlement negotiations. Defendants remaining at the conclusion of the trial were CSX Transportation, Inc., Fruit Growers Express Company, Inc., Norfolk Southern Railway Company, Norfolk and Western Railway Company, and High Point, Thomasville and Denton Railroad Company ("Remaining Defendants"). Norfolk Southern Railway Company is a subsidiary of Norfolk Southern Corporation. Norfolk and Western Railway Company is a subsidiary of Norfolk Southern Railway Company. Finally, High Point, Thomasville & Denton Railroad Company is an affiliate of Norfolk and Western Railway Company. The Court refers to these related entities simply as "Norfolk Southern," unless otherwise indicated. CSX Transportation, Inc. and Fruit Growers Express Company, Inc. are subsidiaries and/or affiliates of CSX Corporation. The Court refers to these entities separately, although witnesses may have referred to them simply as "CSX." All other Defendants settled with Plaintiffs ("Settling Defendants"), and the Court dismissed Settling Defendants in orders filed May 9, 1996 and September 12, 1996.

## II. DISCUSSION

The parties stipulated that the 1992 ROD estimated the cost of the clean-up remedy at the Pneumo Abex site to be $31,962,923.00. The Amended ROD estimated the cost of the remedy to be $31,507,670.00. Finally, the ESD estimated the cost to be $21,000,000.00. (Stip. ¶ 31.) The parties also stipulated that Pneumo Abex has incurred response costs at the Site and that Defendants have not. (Stip. ¶¶ 34, 35.) Thus, the questions remaining are 1) which of the costs Plaintiffs allegedly have incurred in connection with the Site are recoverable as response costs and 2) what portion of those costs Remaining Defendants must pay.

Plaintiffs presented proof of their alleged costs as follows.

| | | |
|---|---|---|
| 1) Oversight by the EPA— | | $1,740,195.71 |
| 2) The City's costs— | | 112,034.00 |
| 3) The PRHA's costs— | | 93,405.85 |
| 4) Services related directly to excavation and removal at the Site— | | 5,334,509.00 |
| **TOTAL** | | **$7,280,144.56.** |

Of the total amount, Pneumo Abex allegedly has incurred and paid $7,074,704.00.

### A. *Divisibility of the Harm*

The United States Court of Appeals for the Fourth Circuit has held that "[w]hile CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm." *United States v. Monsanto Co.,* 858 F.2d 160, 171 (4th Cir. 1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). In this case, Remaining Defendants bear the burden of either establishing that the harm is divisible or that there exists a reasonable basis for apportionment, based upon the contribution of each Defendant, of liability for a single harm. *Id.* at 171–72. In their post-trial brief, Remaining Defendants argue that they have established that "the area of environmental harm at the Site attributable to Foundry manufacturing activities is clearly divisible from the area of environmental harm not related to the Foundry." (Defs.' Br. at 3.) Although faced with the possibility that the Court could find the harm indivisible, in their post-trial briefs Remaining Defendants do not present the alternative argument that there exists a rational basis for apportionment of liability.

### 1. *Sources of Contamination*

One of Plaintiffs' experts, John Rhodes, of GEO Engineering, who managed the Site from the beginning of the cleanup activities, testified that his firm tried to identify several sources of lead contamination. The firm considered air emissions and sand from the foundry, lead paint, automobile emissions, ash from an incinerator, and dredge fill material. (R. at 33.) However, the firm was unable to identify reliably sources other than foundry-related ones through the use of its chosen method: canonical analysis. (R. at 33–34.) Canonical analysis is a statistical procedure used to create a "fingerprint" of

known contaminants. (R. at 37.) GEO Engineering gathered soil and dust samples throughout the Site to try to match those samples to the fingerprints, samples of previously identified contaminants. GEO Engineering analyzed the samples for lead content and other metals. (*Id.;* 1994 ROD at 17.) However, GEO Engineering was ultimately unable to fingerprint non-foundry-related sources of lead.

Remaining Defendants also presented the expert testimony of Dr. Swiatoslav Vladmir Kaczmar[2] in an attempt to establish that there existed several sources of contamination in addition to the sand from the foundry. (R. at 629–776.) Dr. Kaczmar drew most of his conclusions from his review of the work performed and reports generated by GEO Engineering (*see, e.g.,* R. at 686, 716); Dr. Kaczmar nor his firm collected any soil samples from the Site. (R. at 727.) In general, Remaining Defendants tried to establish that ash from the City's incinerator, dredge spoils, demolition waste, and miscellaneous fill contributed to the contamination of the Site.[3] For example, Dr. Kaczmar used several demonstrative exhibits to establish the pattern of development and demolition within the Site from 1889 to 1964. (R. at 647–661.) He testified that demolition occurred in all four quadrants of the Site, (R. at 661), and that the demolition left residuals of lead. (R. at 635.) Similarly, on cross-examination, a witness from the PRHA testified that demolition had occurred in quadrants II and IV. (R. at 893–97.) Dr. Kaczmar also testified that there existed *no* basis for linking air emissions to the residuals of lead detected at the Site outside of the foundry-area, (R. at

676), yet later testified that the releases from the foundry were only insignificant sources of contamination. (R. at 716.)

The focal point of Dr. Kaczmar's testimony was that the use of canonical analysis, as a method for identifying materials from the foundry outside of Pneumo Abex's lot, could not be supported by the information in the Remedial Investigation report. (R. at 663.) He emphasized the portion of the Remedial Investigation report which explained the "opportunity for false positives" and the problem of relying upon "single observations" of foundry-related lead contamination without a sufficient number of neighboring samples also being classified as foundry-related. (R. at 686.) Dr. Kaczmar testified that GEO Engineering did not have enough reference points or fingerprints of known contaminants, thus leaving great opportunities for misclassification of samples. (R. at 687.) He testified that GEO Engineering would have needed "hundreds" of reference points to make canonical analysis an appropriate methodology at the Site. (R. at 690.) In response to questions from the Court, however, Dr. Kaczmar testified that for the last classification or canonical analysis he performed for polycholorinated biphenyls (PCBs), he used only six (6) reference points. (R. at 767.) He also testified that GEO Engineering used four to six reference points in this case. (R. at 768, 776.) Dr. Kaczmar also testified to examples within the RI/FS of misclassifications within the reference groups such as a known sample of auto emissions being classified as paint, miscellaneous fill, and sand from the foundry. (R. at 697.) He further testified that the misclassifications

---

**2.** Dr. Kaczmar has a bachelor's degree in chemistry, biology, and water science from Northern Michigan University. (R. at 629.) He holds a master's degree from Northern Michigan University in chemical limnology, the study of the "fate and transport" of chemicals in aquatic systems. (*Id.*) He also has a doctorate degree from Michigan State University in environmental toxicology which includes analytical chemistry, human toxicology, and fate and transport. (R. at 630.) He has performed approximately ten (10) Remedial Investigations and Feasibility Studies as a project manager and supervised approximately 100.

**3.** Plaintiffs objected to much of the testimony or opinions offered by Dr. Kaczmar on two separate grounds. First Plaintiffs objected to the nature

and scope of his proposed testimony because Dr. Kaczmar 'was not a geologist or an engineer, having held himself out previously as a toxicologist. (R. at 633–40.) The Court allowed Dr. Kaczmar to testify and indicated that it would give the testimony due weight, recognizing the witness's limitations. (R. at 640.) Second, Plaintiffs objected on the basis that Dr. Kaczmar did not disclose the offered opinions or bases thereof in his written report made pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Upon reviewing Dr. Kaczmar's report, the Court sustained many of these objections. (*E.g.,* R. at 670–75, 699–700, 701, 704–07, 708–09, 735–36.)

were "a very strong basis for just throwing the canonical analysis right out, at least the application here." (*Id.*)

### 2. Containment of Sand and Air Emissions from the Foundry

At trial, Plaintiffs presented the first evidence to suggest divisibility of harm. John Rhodes testified that he made the argument to the EPA that portions of Quadrant II did not indicate foundry-related contamination and that Quadrant III did not show any indication of foundry-related contamination. (R. at 42–43.) Thus he argued "that at least a portion of quadrants II and III could be carved out of the site as not related to the foundry." The EPA rejected this argument within the 700–foot circle, (R. at 44), and found that "it is reasonable to assume the foundry contributed, either through disposal of waste sand or through air deposition, to lead contamination found in these areas." (Pls.' Ex. 322, 1992 ROD at 101.)

Remaining Defendants also presented testimony from Mr. Elmer Oakes,[4] a former employee and plant manager of Pneumo Abex, that to the best of his recollection, he only saw sand removed from the back lot twice, "a couple of pick-up loads to use for fill." (R. at 942, 955.) However, he also testified that there was no fence around the back lot. (R. at 942.) Mr. Rhodes testified that one mechanism for moving the contaminated sand "that was of concern throughout the study [the RI/FS] and remains a concern is wind blowing of foundry sand." (R. at 221.) Pneumo Abex's lot is within the 700–foot circle designated as the Site, but the Site includes more than Pneumo Abex's lot. Remaining Defendants thus argue that they are not liable for costs associated with the cleanup of the entire Site, but merely the cleanup within the Pneumo Abex's lot.

Dr. Kaczmar also concluded that there existed "no likelihood of foundry sand being outside the foundry areas." (R. at 706.) He reached this conclusion based upon the following:

1) the information in the Remedial Investigation report that the foundry's used sand was exclusively disposed of, by wheelbarrow, within the north lot of the foundry, (R. at 706–07),

2) his analysis of aerial photographs which depicted two major thoroughfares on either side of the foundry that, in his opinion, would have precluded anyone from taking a wheelbarrow full of material to one of the residential areas, (R. at 707,) and

3) GEO Engineering's estimate that over the fifty years of the foundry's operation, the foundry would have generated 140,000 cubic feet of waste sand and that amount "could fit very easily" within the foundry's lot. (R. at 708.)

Dr. Kaczmar also testified about "grain size analysis," which involves taking soil samples and sifting the samples through a series of sieves with each sieve having progressively smaller openings so that the particles or grains separate by size. (R. at 702.) According to Dr. Kaczmar, one then weighs the amount of material that passes through each of the sieves to determine the size of the particles in any given sample. (*Id.*) He also testified that grain size analysis is a "visual" analysis: "You collect a sample and its got some big pieces, small pieces, and some really tiny pieces in it, you can differentiate one from the other." (R. at 703–04.) Based upon GEO Engineering's testing, Dr. Kaczmar concluded that the grain size of the soil samples for quadrants II and III did not match the grain size of the samples from the foundry's lot. (R. at 705.)

■ Despite presentation of evidence indicating several sources of contamination and that the sand remained in certain portions of the Site, Remaining Defendants failed to provide the Court with a way to separate the harms or the costs of cleanup. *Cf. Northwestern Mutual Life Ins. Co. v. Atlantic Research Corp.*, 847 F.Supp. 389, 401 (E.D.Va.1994) ("Although it is reasonably clear that several sources, including the lime pit and the Hot Lab, contributed to the release of hazardous materials at the facility, there is no way to separate out these harms."). The EPA found that the contamination at the Site is foundry-related. While

---

4. Mr. Oakes was employed at the Site from 1946 until its closing in 1978. (R. at 930–31.)

the EPA's determination is not dispositive, the Court finds it more persuasive than Remaining Defendants' proof which fails to provide the Court with a feasible alternative. Thus, the Court finds that the harm at the Site is indivisible.

## B. *Apportionment of Liability*

Remaining Defendants bear the burden, in the case of indivisible harm, of providing the Court with a rational basis for apportionment of liability. In their post-trial brief, however, Remaining Defendants argue that the burden somehow rests with Plaintiffs: "The spotty data produced by Abex makes extrapolation of generators' shares from the few documents highly speculative. . . . Abex, not the Railroad Defendants should bear the consequences of its unexplained failure to produce complete records of shipments to the Foundry for 46 of the Foundry's 51 years of operation." (Defs.' Br. at 20.) The Court recognizes that the parties produced few records to document the activity at the foundry. The foundry operated from 1927 until 1978; however, the parties produced "relatively complete" records for five non-consecutive years and some additional information for a few Defendants who produced their own records. (R. at 436.) The parties also had the benefit of information provided by Mr. Elmer Oakes, who was employed at the foundry for approximately twenty-two (22) years. Despite the paucity of documents, in order to avoid joint and several liability, Remaining Defendants had the burden of providing the Court a rationale for apportionment. *Cf. Chesapeake & Potomac Tele. Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1269, 1279–80 (E.D.Va.1992) (finding that it could not "reasonably divvy up the environmental harm" for a site with six years of incomplete records for company which operated for fifteen years). As the Court explains below, Remaining Defendants failed to carry this burden; however, the Court has been able to fashion from all the evidence a reasonable basis for apportionment.

In this instance, Remaining Defendants are liable for contamination caused by disposal and/or treatment of worn journal bearings. Remaining Defendants attempted to establish the volume of waste, in the form of worn journal bearings, each party contributed to the Site. They offered the testimony and compilation [5] of data of Matthew Low, an engineer and attorney, whose firm developed a database of shipments of lead bearing materials into the foundry. Mr. Low testified that for the years for which he had data, Defendants I shipped approximately 90% of the non-virgin lead-bearing materials to the Site. (R. at 590.) He also testified that CSX Transportation, Inc. and its related entities, Fruit Growers Express Company, Inc., and Norfolk Southern Railway Company and its related entities shipped approximately 66.85% of the lead-bearing material into the Site. (*See* R. at 569, 614–15.) Remaining Defendants presented and the Court admitted most, if not all, of the records used by Mr. Low's firm to create the database. (R. at 624 (admitting Defendants' Exhibits 40–124, 153–55).) However, after cross-examination of Mr. Low, the Court sustained Plaintiffs' objection to the admission of Remaining Defendants' compilation as an exhibit. (R. at 618–20 (Defendants' Exhibit 39 refused).) Cross-examination of Mr. Low indicated numerous inaccuracies and discrepancies between the compilation and the underlying documents. (R. at 575–615.) For example, on cross-examination, Mr. Low admitted that in at least four instances, his firm erred in interpreting the entries in the foundry's records for pounds of worn journal bearings shipped to the foundry. His firm attributed poundage to non-existent entities when the entries were actually for parties to this litigation. Plaintiffs' counsel also pointed out approximately six other discrepancies in Remaining Defendants' compilation. In rejecting the compilation, the Court ruled that although it could accept a summary chart pursuant to Rule 1006 of the Federal Rules of Evidence, Remaining Defendants' compilation did not fairly represent the evidence before the Court: the underlying rec-

---

5. Rule 1006 of the Federal Rules of Evidence provides that "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed.R.Evid. 1006.

ords. *United States v. Bakker,* 925 F.2d 728 (4th Cir.1991); *United States v. Strissel,* 920 F.2d 1162 (4th Cir.1990); *United States v. Porter,* 821 F.2d 968 (4th Cir.1987).

Plaintiffs retained Dr. Kenneth Wise[6] to estimate, *inter alia,* the poundage of worn journal bearings that each Defendant sent to the foundry. Dr. Wise used documents from the foundry that indicated the amount of metal received by the foundry, (Pls.' Exs. 1–27), bills of lading to railroads or from truck drivers, invoices for conversions of worn journal bearings into new journal bearings, and credit letters. (Pls.' Exs. 28–234.) Dr. Wise testified that he had relatively complete information for the years 1961, 1962, 1964, 1967, and 1968. (R. at 436.) Dr. Wise also relied upon the deposition of Elmer Oakes and several other employees of Pneumo Abex, as well as the affidavit of Mr. Oakes. Dr. Wise used Moody's Reports to develop estimates of the amount of material sent by conversion customers. (R. at 430, Pls.' Ex. 244.) Dr. Wise testified that in making his estimate, he considered the possible bias against companies that were not consistent users of the foundry over time. (R. at 437.) From Moody's Reports, he obtained information on the "ton miles[,] or the number of freight miles[,] or [the] number of gondola cars ... to extrapolate for certain companies into years where Elmer Oakes suggested they would have been customers of the foundry but which were not covered by the documents." (R. at 437.) Dr. Wise testified that according to his calculations, which exclude the contributions of Pittsburgh and Lake Erie Railroad Company,[7] Remaining Defendants "Fruit Growers Express along with CSX and Norfolk Southern" delivered 80.1% of the worn journal bearings to the foundry. (R. at 477.) Plaintiffs did not offer as an exhibit a summary of Dr. Wise's projections.

Remaining Defendants objected to Dr. Wise's projections because he relied upon records from only a few of the years at issue.

Dr. Wise also testified that he did not include Third–Party Defendant, Illinois Central Railroad Company in the calculations. (R. at 472.) Furthermore, Remaining Defendants questioned many of the assumptions upon which Dr. Wise based his conclusions, such as suggesting that the estimates assumed consistent usage of the foundry by Defendants as opposed to use of competing operations, (R. at 469), or use of one of Pneumo Abex's foundries in other parts of the country. (R. at 470.) However, Dr. Wise testified that when he made the estimate, he took into account indications that a railroad was not using the foundry in Portsmouth at a particular time. (R. at 470.) He also testified that he made adjustments according to Mr. Oakes's testimony about how long a railroad was a customer of the foundry. (R. at 474.)

■ The Court finds Dr. Wise's methodology to be a reasonable approach for estimating the contributions of Defendants and that it reflects more accurately the available records than does Remaining Defendants' compilation as presented by Mr. Low. Furthermore, having rejected Remaining Defendants' compilation as unrepresentative of the underlying records, use of Dr. Wise's calculations is the only way for the Court to avoid assigning Remaining Defendants with 100% of Defendants' Share of the liability (minus the amounts of settlements). Accordingly, the Court assigns Remaining Defendants 80.1% of Defendants' Share as discussed below in section III.D.

## C. *Recoverable Costs/Costs Consistent with the NCP*

■ Section 107(a)(4)(B) provides that Remaining Defendants are liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." Plaintiffs, however, bear the burden of proving that their response costs are consistent with the national contin-

---

6. Dr. Wise holds a bachelor's degree in physics from Harvey White College and a doctorate in economics from Massachusetts Institute of Technology. (R. at 420.) He has experience in the lead industry and other metals markets. (R. at 420–22.)

7. Counsel for Defendant Pittsburgh and Lake Erie Railroad Company indicated that his client had filed for relief under Chapter 11 of the Bankruptcy Code. The Court released counsel from the trial pursuant to the automatic stay of Chapter 11. 11 U.S.C. § 362 (1994).

gency plan (the "NCP"). *United States v. Northeastern Pharmaceutical & Chem. Co., Inc.,* 810 F.2d 726, 747 (8th Cir.1986); *United States v. J.M. Taylor,* 909 F.Supp. 355, 362 n. 8 (M.D.N.C.1995). Remaining Defendants contend that Plaintiffs have not established that many of their costs are either necessary or consistent with the NCP. Remaining Defendants also argue that the applicable statute of limitations bars some of Plaintiffs' claims. More specifically, Remaining Defendants challenge Plaintiffs' claims for the costs of oversight by the EPA and the VDWM, attorneys' fees, the lost time of the employees of the City and the PRHA, and medical monitoring. Remaining Defendants also charge that Plaintiffs are attempting to win "multiple recovery" by presenting more than one bill for a single expense.

The Court begins its analysis with the recognition that CERCLA does not define the phrase "costs of response." CERCLA does, however, define "response." The statute defines "response" as "remove, removal, remedy, and remedial action; ... all such terms ... include enforcement activities related thereto." CERCLA § 101(25). CERCLA further defines remove and removal in § 101(23) and remedy and remedial action in § 101(24). Thus, it appears that the costs of removal and remedial actions are costs of response. *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1154 (9th Cir. 1989).

The Court now turns to the requirement that the costs of response be consistent with the NCP. The purpose of the NCP "is to provide the organizational structure and procedures for preparing for and responding to ... releases of hazardous substances...." 40 C.F.R. § 300.1 (1995). "The NCP provides ... for [p]rocedures for undertaking response actions pursuant to CERCLA...." 40 C.F.R. § 300.3(b)(4) (1995). The regulations further provide as follows:

> For the purpose of cost recovery under section 107(a)(4)(B) of CERCLA:
>
> (i) A private party response action will be considered "consistent with the NCP" if

the action, when evaluated as a whole, is in *substantial compliance* with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup; and

> (ii) Any response action carried out in compliance with the terms of ... a consent decree entered into pursuant to section 122 of CERCLA will be considered "consistent with the NCP."

40 C.F.R. § 300.700(c)(3) (1995) (emphasis added). Most of Plaintiffs' claimed costs are for the services rendered by the vendors, contractors, and subcontractors who conducted the actual work at the Site; "the main thrust of the remedy is to excavate soil containing lead." (R. at 49.) Plaintiffs have conducted this work under the direction of the EPA and the VDWM, consistent with various administrative orders and consent decrees. (*E.g.,* R. at 48–52; 250–55.) The Court thus finds that the majority of the claimed costs are recoverable.

### 1. *Statutes of Limitations*

Section 113(g)(2)(A) of CERCLA provides in relevant part that actions for the recovery of costs referred to in § 107 for a removal action "must be commenced ... within 3 years after the completion of the removal action." Remaining Defendants argue that the action for recovery of the costs associated with the Consent Order of 1986 is time-barred. Remaining Defendants rely upon the EPA's statement in the administrative order of March, 1992, issued pursuant to § 106(a) of CERCLA, that the removal action under the 1986 Consent Order was completed "on or about February of 1988." (Pls.' Ex. 314, at 3.) Plaintiffs filed their complaint in July of 1994. Remaining Defendants do not cite any cases for the proposition that a statement from the EPA in a unilateral administrative order is dispositive of the issue of when the statute of limitations tolls.[8] Plaintiffs counter that for purposes of the statutes of limitations, all activity up to and including issuance of a record of decision constitutes the removal action.

---

8. Defendants do, however, cite *Kelley v. E.I. Du-Pont de Nemours & Co.,* 17 F.3d 836, 840 (6th Cir.1994) and *One Wheeler Rd. Assocs. v. Foxboro*

*Co.,* 843 F.Supp. 792 (D.Mass.1994), which held that the removal actions were not complete until the last removal action concluded.

In *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 840 (6th Cir.1994), the United States Court of Appeals for the Sixth Circuit affirmed the district court's ruling that "surface removal activity and the RI/FS comprise a single removal action for statute of limitations purposes." In that case, the defendants argued that the surface removal activity was an emergency physical removal under § 104(a) of CERCLA and the RI/FS was conducted pursuant to § 104(b). Thus, they argued that because different subsections of the Act governed the activities, the activities were distinct, with two different dates of completions. In finding that both activities comprised one removal action, the Sixth Circuit found that the two subsections were interrelated and implied Congress's expectation that both types of activities would be taken in tandem. *Id.* at 840–41.

■ Several district courts have held that the statute of limitations does not begin to run until the EPA issues the record of decision. *E.g., United States v. Davis*, 882 F.Supp. 1217, 1225–27 (D.R.I.1995) (citing cases); *California v. Celtor Chem. Corp.*, 901 F.Supp. 1481, 1487–89 (N.D.Cal.1995). Citing *Kelley v. E.I. DuPont de Nemours & Co.*, the district court in *Celtor Chem. Corp.* found that the first phase of the cleanup was the removal action which ended when the EPA signed the ROD and that "[a]ll of the cleanup activities which took place within this time period, including the Remedial Investigations and Feasibility Studies, constitute a single 'removal action' under CERCLA." 901 F.Supp. at 1488. The Court finds persuasive the reasoning of these cases. Plaintiffs have been engaged in this cleanup for some time; however, their efforts have been continuous and the EPA did not issue the ROD until 1992 and the Amended ROD until 1994. Thus, the Court finds the statute of limitations bars none of Plaintiffs' claims presented to the Court.

### 2. *Costs of Oversight*

Plaintiffs petition the Court for recovery of the costs they reimbursed the EPA for oversight of the cleanup activities. Pursuant to the Consent Decree, Plaintiffs have reimbursed the EPA $1,170,131.37, and the Court received testimony that subsequent to the Consent Decree, Plaintiffs have paid the EPA an additional sum of $570,064.34 for a total of $1,740,195.71 (R. at 377–78, Pls.' Exs. 259, 363.) Plaintiffs argue that because the Consent Decree required them to reimburse the EPA for its costs of oversight, they should be able to recover Remaining Defendants' proportional share. As for the involvement of the VDWM, Plaintiffs conducted the RI/FS under the supervision of VDWM. Also, the EPA and the Commonwealth of Virginia jointly published the 1992 ROD and the Amended ROD. Remaining Defendants argue that only the EPA's costs associated with the Remedial Investigation/Feasibility Study ("RI/FS") conducted pursuant to the consent order of 1989 are recoverable. They further argue that the RI/FS terminated with the final document in February, 1992. Remaining Defendants make no mention of costs associated with the oversight of VDWM.

■ The United States Court of Appeals for the Fourth Circuit has not addressed the recovery of costs for agencies' oversight. In support of their position, Remaining Defendants cite *United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1278 (3d Cir.1993), which drew a distinction between the government's role in performing cleanups and the government's role in supervising cleanups by private parties. *Cf. United States v. Lowe*, 864 F.Supp. 628, 632 (S.D.Tex.1994) (holding that *Rohm & Haas* leads "to the incongruous result that the EPA could recover the costs of overseeing its own contractors but not the costs of overseeing those hired by the potentially responsible parties"). Discussing § 104(b) of CERCLA, the United States Court of Appeals for the Third Circuit held that an RI/FS is one type of investigation contemplated by § 104(b) and is thus a removal action. *Rohm & Haas*, 2 F.3d at 1277. However, the Third Circuit held that "if what the government is monitoring is not the release or hazard itself, but rather the performance of a private party, the costs involved are non-recoverable oversight costs." *Id.* at 1279. Plaintiffs cite a number of cases which have not similarly restricted recovery of the costs of oversight. *E.g., United States v.*

*R.W. Meyer, Inc.*, 889 F.2d 1497 (6th Cir. 1989); *California v. Celtor Chem. Corp.*, 901 F.Supp. 1481 (N.D.Cal.1995); *United States v. Lowe*, 864 F.Supp. 628 (S.D.Tex.1994). In *R.W. Meyer, Inc.*, the United States Court of Appeals for the Sixth Circuit held that § 107(a) authorized the recovery of indirect costs. 889 F.2d at 1504. In rejecting the defendant's arguments, the Sixth Circuit explained as follows:

> [T]o the extent cleanup actions are necessary, we are persuaded that the statute contemplates that those responsible for hazardous waste at each site must bear the full cost of cleanup actions and that those costs necessarily include both direct costs and a proportionate share of indirect costs attributable to each site. In essence then, the allocation of indirect costs to specific cleanup sites effectively renders those costs direct costs attributable to a particular site.

*Id.* This Court is most persuaded by the reasoning of the Sixth Circuit. In this instance, the cleanup would not occur without the oversight of the EPA and the VDWM. Thus, the Court finds that these costs of oversight by the EPA and the VDWM are necessary costs of response consistent with the NCP. The Court notes that Plaintiffs have not submitted a claim for the costs of oversight by VDWM. The Court accordingly finds that Plaintiffs may recover the costs of oversight by the EPA that they have already incurred, and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (1994), Plaintiffs may recover any future costs of oversight by the EPA and the VDWM that are consistent with the NCP and this memorandum opinion and order.

### 3. *Attorneys' Fees*

In *Key Tronic Corp. v. United States*, 511 U.S. 809, ——, 114 S.Ct. 1960, 1967, 128 L.Ed.2d 797 (1994), the United States Supreme Court held that "some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B)" and is thus recoverable. In that instance, the Supreme Court considered whether the plaintiff-petitioner could recover the costs associated with pursuing an action for recovery of costs, the cost of the attorneys' efforts to identify potentially responsible parties ("PRPs"), and the costs of the negotiations between the plaintiff-petitioner and the EPA which culminated in a consent decree. The Supreme Court placed the costs at issue into two broad categories: 1) traditional expenses of litigation and those incurred to protect Key Tronic's interest as a defendant in proceedings that established the extent of its liability and 2) expenses which increase the probability that cleanup will be effective and paid for and that serve a statutory purpose other than the reallocation of costs. *See id.* at —— – ——, 114 S.Ct. at 1967–68. The Supreme Court held that the plaintiff-petitioner could recover only the attorneys' costs for identifying PRPs. *Id.* at ——, 114 S.Ct. at 1967.

Corporate Counsel for Whitman Corporation testified that one law firm, Winston and Strawn, assisted Pneumo Abex in its dealings with the EPA in a number of ways. (R. at 239.) He further testified that the law firm 1) assisted in the discussions of the appropriate remedy, 2) participated in various activities involving cleanup, and 3) assisted in identifying PRPs. (*Id.*) Although this witness testified that he did not know if the invoices involved negotiating the consent decree in 1986, (R. at 245), the Court's review of the invoices indicate that they cover the period from 1991 to 1994. The witness also testified that the invoices covered a period too early in time to be associated with the latest consent decree which the Court entered in 1996. (*Id.*)

The Court's review, however, also uncovered some deficiencies in Plaintiffs' proof of its recoverable costs. For example, many of the invoices contain entries for conferences among attorneys within the firm. Although the entries indicate that the conferences were held to discuss the Site, the Court is unable to discern whether the conferences concerned Plaintiffs' liability, consent decrees or administrative orders, or the technicalities of the cleanup. For example, one of the invoices from Winston and Strawn lists one hour of billable time for "Status and strategy conference with J. Homsy." (Pls.' Ex. 258 Moore 1.) This conference could have in-

volved the technicalities of the cleanup, the recovery of costs from other PRPs, or any number of matters for which Plaintiffs may or may not be entitled to recover; Plaintiffs simply did not illuminate the nature of such expenses. Another invoice contains an entry for eleven (11) hours for "Preparation for meeting with U.S. EPA." (Pls.' Ex. 258 Moore 1.) The Court does not know if the meeting involved negotiations for a consent decree for which costs would not be recoverable or if it involved some compliance issue for which costs may be recoverable. The invoices also contain numerous entries for "Photocopy Miscellaneous Environmental Documents." Plaintiffs did not offer testimony of how or if the firm segregated photocopying charges related to the cleanup from those that were not. Similarly, the Court could not discern whether the long distance telephone charges were related to the cleanup. Also, throughout the invoices, portions of the descriptions of the billed for activities have been blacked-out and the total number of hours associated with the activities have been adjusted, presumably downward, by handwritten notations. Plaintiffs offered no testimony to establish how they or the law firm adjusted the hours. Furthermore, the manner in which the adjustments are indicated in the records suggests to the Court that these adjustments were made long after Plaintiffs incurred the costs, when memories may have been inaccurate or incomplete.

■ Corporate Counsel for Pneumo Abex [9] testified that another law firm, Bingham, Dana & Gould provided legal assistance through legal research, identifying actions the EPA had taken at other sites contaminated with lead, addressing legal issues in formulating work plans, addressing issues of compliance and issues that arose during the response activities, and assisting with the contracts of vendors and contractors. (R. at

376–77.) These invoices covered the period from 1986 to 1990. This witness further testified that one of the law firm's functions was "to protect the corporate interest." (R. at 388.) When asked on cross-examination in a series of questions whether he could separate the services of the law firm into those that protected the corporate interest generally and those associated with the cleanup, (R. at 388–91), the witness answered that such a separation was "not a distinction that makes sense" to him. (R. at 391.) One of the invoices from Bingham, Dana & Gould lists "Prep for, attend meeting at Abex re strategy on remedial issues and NPL listing" for $1,182.50. (Pls.' Ex. 258 Kenfield 1.) Another example is "Telephone conference with Rhodes and Lee" for $60.00. (*Id.*) Without further explanation, the Court cannot reasonably conclude that the firm performed this work in connection with the actual cleanup as opposed to protecting Pneumo Abex's interest in its attempt to limit its liability or avoid listing on the NPL.

Although Plaintiffs presented two witnesses to lay a foundation for the admission of the invoices from the two law firms, the Court, through its examination of the exhibits, is unable to discern whether many of the expenses incurred are "closely tied to the actual cleanup." [10] Unlike the plaintiff-petitioner in *Key Tronic*, Plaintiffs did not provide the Court with a categorization of its attorneys' fees. Rather, Plaintiffs provided the Court with two sets of invoices, totalling more than 500 pages, with the only assistance to the Court being the total cost for each law firm. The Court thoroughly reviewed the exhibits and has found that a portion of Pneumo Abex and Whitman Corporation's claimed attorneys' fees are closely tied to the actual cleanup and are recoverable.

9. For clarification, the Court understands that the witness was employed by Abex Corporation in 1986 and is currently employed by McAndrews & Forbes, a holding company. Pneumo Abex went through a series of changes in its corporate structure, and McAndrews and Forbes now manages this case for Pneumo Abex. However, the Court is primarily concerned with the witness's involvement as a past and present legal representative for Pneumo Abex. (R. at 365–67.)

10. The Court notes that Plaintiffs merely "dumped" voluminous invoices in the record without sufficient explanation of the presumably relevant information within the exhibits. The Court questioned whether this practice could create any difficulties, and Remaining Defendants indicated that they would be challenging specific items. (*E.g.*, R. at 244–46, 403, 407, 424.)

Regarding the City's claim for the services of its outside legal counsel, Hogan and Hartson, L.L.P., the Court examined the invoices and allowed only those portions that the Court could reasonably attribute directly to the cleanup. The Court similarly allows the costs for the services of the PRHA's outside legal counsel, Cooper Spong & Davis. Also, the Court notes that portions of several of the entries for Hogan and Hartson, L.L.P. were redacted, but the corresponding hours for those activities had not been adjusted. (Pls.' Ex. 279.) Furthermore, the City's and the PRHA's proof suffered from many of the same deficiencies that Pneumo Abex's and Whitman Corporation's proof did.

### 4. The Lost Time of the Employees of the City and the PRHA

Plaintiffs presented evidence of the time spent by employees of the City and the PRHA in dealing with the Site. They calculated the portion of each employee's salary that could be attributed to the time spent on the Site. Remaining Defendants argue that the lost time is a form of economic loss that is not recoverable under CERCLA. Plaintiffs respond that the use of the employees of the City and the PRHA rather than consultants does not render the costs of such work unrecoverable. Plaintiffs cite *T & E Indus., Inc. v. Safety Light Corp.*, 680 F.Supp. 696 (D.N.J.1988), in support of their position that the time spent by the employees of the City and PRHA are recoverable because the activities performed by these employees were required by the NCP. In *T & E Indus.*, the district court found that the plaintiff could recover for the time spent by its president if it could adduce sufficient facts to demonstrate that he was personally involved in monitoring, evaluating, and minimizing the contamination. 680 F.Supp. at 707. *Cf. Hatco Corp. v. W.R. Grace & Co.*, 849 F.Supp. 931, 971–72 (D.N.J.1994) (holding that salaries of management and personnel are recoverable as indirect costs associated with general operation of response action). In so holding, the court rejected the defendants' argument that it should draw a distinction between costs recoverable by the government and those recoverable by private parties. *Id.* at 706. Remaining Defendants cite

*Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 126 B.R. 656, 663 (D.Mass.1991), *aff'd in part, rev'd in part on other grounds*, 993 F.2d 915 (1st Cir.1993), in support of their position that the lost time is not recoverable.

In finding that the value of the time of the plaintiff's employees was not recoverable, the bankruptcy court explained as follows:

> Nothing in the statutory language of CERCLA indicates that employee time should be considered a cost of response. Rather, employees must be paid whether or not they have to spend their time addressing waste cleanup efforts; these costs are not made necessary by the improper disposal of wastes. To interpret CERCLA to require reimbursement of employee time and effort would, in effect, compensate CERCLA plaintiffs for lost employee productivity. But CERCLA was never intended to provide for the recovery of business losses.

*Id.* The bankruptcy court relied upon *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1287 (D.Del.1987), *aff'd*, 851 F.2d 643 (3d Cir.1988), which held that losses resulting from idling property and equipment were not recoverable because they were economic losses. The Court finds Remaining Defendants' reliance upon this line of cases unpersuasive, particularly because the losses discussed in *Artesian Water Co.* were those associated with the business previously conducted upon the contaminated site, not with the losses and/or costs associated with the actions taken in response to contamination.

As a result of responding to the contamination for which Defendants' are partially responsible, the City and the PRHA presumably faced one or more of three scenarios because they did not hire outside consultants to handle the situation: 1) existing personnel diverting their time from other governmental affairs to attend to the Site and other matters remained unaddressed, 2) *hiring* of new personnel, temporary or permanent, to compensate for the increased work load, or 3) existing personnel working overtime. Regardless of which scenario occurred, the

Court finds that CERCLA provides for all liable parties to share in the costs. The Court now turns to Plaintiffs' proof of these indirect costs.

To calculate the costs for the time of the employees of the City and the PRHA, Plaintiffs referred to the calendars of the personnel involved and estimated, based upon entries in the calendars, how many hours the employees spent dealing with the Site. The City presented calendars for several employees. The Court found this documentation to be problematic for several reasons. First, many of the entries in the calendars are illegible because of poor quality photocopies. (*E.g.,* Pls.' Ex. 266.) Second, although the activities described may be directly related to cleanup and the entries provide the times at which the activities presumably began, the entries do not include when the activities ended. (*E.g.,* Pls.' Ex. 269.) Also, these estimates of time are not contemporaneous with the occurrence of the meeting or activity but have been made after the fact for meetings dating back to as early as 1991. (*See, e.g.,* Pls.' Ex. 269.) For example, the Director of Operations for the PRHA testified as follows about how the PRHA calculated its employees' hours:

> We had my secretary, who also serves as the secretary of the Executive Director and at the time served as secretary to the Director of Housing, she went through and compiled meeting dates from our calendars. She saves our calendars going back a number of years. Whenever we had a meeting scheduled with CSX or Abex, or related to Abex, she would know the meeting related to Abex and what topic. She went back and computed those over the pas[t] three or four years.

(R. at 883.) One example of such a computation is an entry in the PRHA's proof for work from 1992 to 1995 by six (6) employees for sixty-nine (69) hours. The Court is unable to verify such claims. The witness further testified that "[t]he secretary went through the calendar, and where we had a meeting noted—for example, if we had a 1:00 meeting noted for Abex and then we had a 2:00 meeting for something totally unrelated, she would put an hour down and assign it to the Abex category." (R. at 884.) Although a meeting may have appeared on an individual's calendar, the Court cannot be certain that the individual actually attended the meeting nor can the Court be certain that the individual remained at the meeting until the next appointment on his/her calendar. The witness was asked if he thought the calendared time or uncalendared time would be greater for the employees and he replied:

> Well, certainly my experience has been that we do not keep time the way attorneys do. So if I had a meeting with two other people in the office to discuss something that came through on Abex or something from EPA or whatever, we might discuss it for an hour or two hours, but I don't run in and mark that on my calendar, so I would say that the time that my secretary was able to document for meetings would be the tip of the iceberg in terms of the amount of time that's spent dealing with Abex over the years. . . .

(R. at 886.) Although the City and the PRHA may have spent much more time on the Site than they have claimed, the Court must still question the reliability or accuracy of the claims presented. This uncertainty is largely insurmountable, particularly because Plaintiffs did not present testimony from any of the individuals who actually made the estimates of time.

Furthermore, Plaintiffs made little or no showing that these activities and associated costs were "necessary response costs consistent with the NCP." On several occasions, the Court cautioned Plaintiffs to provide specific testimony about the exhibits, but Plaintiffs continued to cursorily offer voluminous pages into evidence without attempting to clarify many issues on re-direct examination. (*E.g.,* R. at 245–46, 407, 424.) Also, many of the witnesses through whom the exhibits were offered were for the most part custodians of the records and did not have direct knowledge of why the costs were incurred. (*E.g.,* R. at 244, 412.) The lack of "direct knowledge" testimony is particularly problematic when the Court attempts to discern the meaning of entries such as "EPA" for one hour or "Fisher Funeral Home Issues" for four (4) hours. (Pls.' Ex. 265.)

■ Although the Court finds that as a matter of law indirect costs for the work performed by employees of PRPs may be recoverable, the deficiencies of Plaintiffs' proof in this case prevent recovery for most of their claims for the salaries of the employees of the City and the PRHA.

### 5. Medical Monitoring/Department of Health's Costs

Remaining Defendants also contend that the City and the PRHA may not recover costs associated with "medical monitoring." They cite *Price v. United States Navy*, 39 F.3d 1011, 1017 (9th Cir.1994) and *Daigle v. Shell Oil Co.*, 972 F.2d 1527 (10th Cir.1992) in support of their position. However, Remaining Defendants provide no discussion of the facts or reasoning of these cases or how they apply to the case at hand. Plaintiffs seek recovery of costs for tests for the level of lead in the blood of the residents of the Site, clinic visits, and a survey. (Pls.' Ex. 273; R. at 404.) Having reviewed the cases Remaining Defendants cite, the Court does not find that these costs are of the type considered in those cases.

■ The United States Court of Appeals for the Ninth Circuit in *Price* followed *Daigle* in holding that an individual homeowner could not recover "the cost of medical monitoring to detect the onset of any latent disease caused by exposure to hazardous waste." 39 F.3d at 1014, 1015–17. In *Daigle*, the United States Court of Appeals for the Tenth Circuit upheld a denial of the plaintiffs' claim for the establishment of a fund to finance long term medical monitoring or surveillance to detect the onset of latent disease. However, the Ninth Circuit has clarified its position in *Price* to explain that it held "that private party medical monitoring activities, *initiated and coordinated independently of ongoing CERCLA cleanup efforts*, were not § 9601 removal or remedial actions.... [However,] [t]he reasoning in *Durfey [v. E.I. DuPont De Nemours & Co.*, 59 F.3d 121 (9th Cir.1995) ] and *Price* does not apply to health assessment and surveillance actions engaged in by a governmental agency pursuant to explicit CERCLA provisions. *Hanford Downwinders Coalition,*

*Inc. v. Dowdle*, 71 F.3d 1469 (9th Cir.1995) (emphasis added). In *Hanford Downwinders Coalition*, the Ninth Circuit considered costs incurred by the Agency for Toxic Substances and Disease Registry ("ATSDR"), established by CERCLA § 104(i) which is not at issue in the instant case. However, in this case, the VDWM, one of the lead agencies at the Site, asked the City's Health Department to conduct the screening to help VDWM determine the necessity of immediate soil removal. (Pls.' Ex. 274.) Each of these cases discusses recovery of costs for *personal* injuries or diseases as being inconsistent with the legislative history and distinguished such costs from the examples of removal actions provided in § 101(23) of CERCLA. This Court finds that in the instant case "[t]o the extent that plaintiffs seek to recover the cost of medical testing and screening conducted to assess the effect of the release or discharge on public health or to identify potential public health problems presented by the release, however, they present a cognizable claim under section 9607(a)." *Brewer v. Ravan*, 680 F.Supp. 1176, 1179 (M.D.Tenn.1988). The blood tests in this case do not appear to be the result of the residents' personal concerns but a result of the VDWM's attempt to assess the effects of the release or threatened release upon the residents of the Site and the rapidity with which Plaintiffs needed to respond to the release or threatened release. Accordingly, the Court finds that these medical costs are recoverable.

### 6. JSG Technical Services

■ Remaining Defendants also argue that JSG Technical Services ("JSG") did not perform response activities and, thus, Plaintiffs may not recover the cost of JSG's services. JSG became involved with the Site after issuance of the consent decree in 1986. Remaining Defendants focus on some of the descriptions of work in JSG's invoices such as "professional services" "management services," and "environmental management services." (Pls.' Ex. 258 Bassano 10.) Although the Court recognizes that these are rather vague descriptions, Plaintiffs offered testimo-

ny to clarify the services provided. The president of JSG testified as follows:

> [JSG] reviewed a work plan that was submitted to the EPA, designed curbing, fencing, capping and storm water runoff that was constructed at the site; hired contractors to do the excavation, sampling, construction, and testing required; and I reviewed invoices for those contractors to ensure that the work was done that was invoiced for, and the invoices were accurate, and I approved invoices for that work.

(R. at 338–39.) He also testified that he worked on "treatability studies ... working toward other means of treating the material rather than disposing of it...." (R. at 339–40.) The Court finds this testimony credible and sufficient evidence to establish that JSG assisted in the cleanup and removal of hazardous substances and took actions consistent with a permanent remedy. JSG provided services "to prevent, minimize, or mitigate damage to public health or welfare or to the environment ... [including] security fencing or other measures to limit access," CERCLA § 101(23), and performed or oversaw the performance of such tasks as collection of runoff and excavation. CERCLA § 101(24). Accordingly, the Court finds that Plaintiffs may recover the costs of these services as well as those of contractors and vendors listed in Plaintiffs' Exhibit 259.

### 7. *Multiple Recovery*

In their post-trial brief Remaining Defendants provide the Court one example of Plaintiffs allegedly seeking to recover twice for one invoice. The Court received testimony that Pneumo Abex sent many of the invoices for work at the Site to its counsel, Winston and Strawn. (R. at 288.) Winston and Strawn then paid the vendors and subcontractors and, according to Remaining Defendants, billed Pneumo Abex for "expert consulting fees." At trial Plaintiffs submitted the bills from Winston and Strawn as well as invoices from their vendors and subcontractors. Based upon this information and this one example, Defendants argue that "at the least all of Winston's entries labeled 'expert consultation fees' [should] be re-

moved from the total response costs figure." (Defs.' Br. at 28.)

The Court makes several observations in addressing Remaining Defendants' concern. First, Remaining Defendants have provided the Court with one invoice number to be found in Plaintiffs' Exhibit Dunnell 1. More than 500 loose pages comprise Plaintiffs' Exhibit Dunnell 1. Remaining Defendants also direct the Court's attention to Plaintiffs' Exhibit 258 Moore 1, the invoices from the law firm of Winston and Strawn. In reviewing the law firm's invoices, the Court has not included in Plaintiffs' recoverable costs the entries for "expert consultation fees." Furthermore, testimony suggests that these entries were offered as proof that the invoices from vendors, contractors, and subcontractors listed separately in Plaintiffs' Exhibit 259 and provided in Plaintiffs' Exhibits Dunnell 1 and Dunnell 2 were paid on behalf of Pneumo Abex by its counsel. Remaining Defendants have simply failed to adduce sufficient proof for the Court to find that Plaintiffs are attempting to exact double recovery. Furthermore, the Court's independent review of the documentation does not suggest such difficulties.

### 8. *Total Recoverable Costs*

 The Court conducted an extensive review of Plaintiffs' documentation of costs. With the exception of the documentation for technical services by vendors, contractors, and subcontractors, Plaintiffs' proof suffered from a lack of direct testimony by individuals with personal knowledge of how or why Plaintiffs incurred the costs. Plaintiffs also failed to separate from the total cost those costs closely tied to the cleanup. For example, many of the costs were associated with consent decrees, particularly attorneys' fees.

### a. *The City's Costs*

The Court disallows much of the City's claimed costs for the services of SCS Engineers because the invoices are for services rendered in the area known as Southside or Portcentre Commerce Park ("Portcentre"). (Pls.' Ex. 275.) Although Portcentre overlaps the Site to a large degree, Plaintiffs offered the Court no method for delineating

which costs were associated within the Site versus those outside of the 700–foot circle. (*See* R. at 415–16, 876–77.) The Court has no rationale for apportioning those costs. Also, the City submitted costs for long distance telephone bills, (Pls.' Ex. 270), and costs to send one of the resident families to a meeting with the EPA in Washington, D.C. (Pls.' Ex. 271.) Plaintiffs offered no evidence that these costs were necessary and consistent with the NCP. The Court previously has discussed the unreliability of the records upon which Plaintiffs base their claim for the lost time of employees of the City.

### b. *The PRHA's Costs*

The documentation for PRHA's costs suffers from many deficiencies. For example, one entry for employee time for $43.54 simply indicated "Gordon Wheatley meeting with Mrs. Bailey." (Pls.' Ex. 261.) The Court does not know the nature of the meeting and Plaintiffs offered no testimony to explain the entry in the record. Another example is "Meeting in PA (STH) Abex" for $1,000.00. Nothing in the record suggests to the Court the nature of this meeting, other than the blanket statement that these are "amounts paid by PRHA relating to Abex Superfund Site." (R. at 882.)

As the Court has discussed above, Plaintiffs bore the burden of establishing that the costs were necessary and consistent with the NCP. Having reviewed Plaintiffs' claims, the Court finds that the following amounts were necessary response costs consistent with the NCP:

| | | |
|---|---|---|
| 1) | Oversight by the EPA— | $1,740,195.71 |
| 2) | The City's costs— | 14,072.67 |
| 3) | The PRHA's costs— | 15,590.64 |
| 4) | Attorneys' Fees—Whitman Corporation and Pneumo Abex | 44,818.50 |
| 5) | Services related directly to excavation and removal at the Site—Whitman Corporation and Pneumo Abex | 5,014,888.74 |
| | *TOTAL* | $6,829,566.26. |

### D. *Plaintiffs' Share and Defendants' Share*

■ As the Court indicated in its order of March 25, 1996, the Court will determine Plaintiffs' Share and Defendants' Share. CERCLA specifically provides for the Court to use equitable factors in an action for contribution pursuant to § 113(f)(1). Although the instant action is not one for contribution, the Court will use these factors to ensure that the responsible parties bear their fair share of liability. In making this determination, the Court considers several equitable factors. One factor is "the degree of involvement by parties in the generation, transportation, treatment, storage, or disposal of hazardous substances." *United States v. Monsanto Co.*, 858 F.2d 160, 168 n. 13 (4th Cir.1988). The district court in *Weyerhaeuser Co. v. Koppers Co.*, 771 F.Supp. 1420, 1426 (D.Md.1991), listed the following as factors which courts have considered in allocating response costs:

1) the ability of the parties to distinguish their contribution to the discharge, release, or disposal of hazardous waste;

2) the amount of hazardous waste involved;

3) the degree of toxicity of the hazardous waste involved;

4) the degree of care exercised by the parties with respect to the hazardous waste concerned;

5) the degree of cooperation by the parties with government officials to prevent any harm to the public or the environment;

6) the benefits received by the parties from the contaminating activities; and

7) the knowledge and/or acquiescence of the parties in the contaminating activities.

*Id.* Other courts have also considered the financial resources of the parties involved. *E.g.*, *Central Maine Power Co. v. F.J. O'Connor Co.*, 838 F.Supp. 641, 645 (D.Me.1993).

■ In their post-trial brief, Remaining Defendants argue that as owners and operators of the Site, Plaintiffs should bear most of the costs of cleanup. They argue that the relevant equitable factors are control, culpability, and benefit. (Defs.' Br. at 13–16.) Remaining Defendants also try to rebut the inferences Plaintiffs attempted to raise at trial concerning Remaining Defendants' alleged recalcitrance and ability to pay. (*Id.* at 17–19.) Plaintiffs' post-trial brief similarly focused upon Remaining Defendants' refusal

to contribute to the response action, the EPA's issuance of § 106 unilateral administrative orders, and Remaining Defendants' financial resources. (Pls.' Br. at 16–18.) The Court's consideration of many of these factors, as discussed below, suggests that Plaintiffs and Defendants should equally bear the costs of cleanup.

### 1. Degree of Involvement, Degree of Care, and Knowledge and/or Acquiescence

Pneumo Abex is the most obvious PRP at the Site. It owned and operated the foundry which used worn journal bearings and other materials to cast new journal bearings. As the Court explained in its memorandum opinion and order of March 25, 1996, Pneumo Abex placed the bearings in a furnace to melt them down for re-casting. Pneumo Abex added other metals to the molten scrap to comply with the Association of American Railroads' specifications. The furnaces used were vented to the outside and produced emissions of fine particulate material. Pneumo Abex poured the molten material into sand molds to form the backs of journal bearings. After the backs hardened and Pneumo Abex machined them, Pneumo Abex lined the backs with the scrap lining metal (babbitts) that it had separated from the scrap journal bearings initially. Pneumo Abex reused the sand until the sand lost its capacity to form molds. After washing the sand to reclaim bits of brass, Pneumo Abex placed the sand in a nearby creek from approximately 1946 to 1961. After 1961, it placed the sand on the back lot of its property. (R. at 940–41.) However, there is no evidence to suggest that Pneumo Abex knew that it would be subject to liability for its disposal of the sand. (See R. at 942.)

Defendants I, however, displayed greater involvement in the treatment and/or disposal of the hazardous substances than many other generators of hazardous substances. For example, Defendants I shipped worn journal bearings to the foundry in their own rail cars. (R. at 939.) They also had company representatives visit the foundry on a regular basis to inspect the new journal bearings and the operation in general. (R. at 937–38.) Mr. Oakes testified that the contracts be-

tween the foundry and Defendants I required access to the foundry per the Association of American Railroads' specifications for lined journal bearings as follows:

The inspector representing the purchaser shall have free entry, at all times, while the work on the contract of the purchaser is being performed, to all parts of the manufacturer's works which concern the manufacture of the material ordered. The manufacturer shall afford the inspector, that the material is being furnished in accordance with these specifications. Tests and inspection shall be made at place of manufacture prior to shipment unless otherwise specified.

(Pls.' Ex. 362 at 3, R. at 937.)

Landowner Defendant Holland Investment and Manufacturing, Inc. purchased the foundry in 1984 and conducted vehicle maintenance and repairs on the lot. (Stip. ¶ 16.) Holland Investment and Manufacturing, Inc. moved its operation from the Site in late 1987 or 1988. (R. at 218.) Mr. Rhodes of GEO Engineering testified that as for the contamination of the property owned by Landowner Defendant Runnymede Corporation, "Clearly the very high levels of lead in that area are the result of the foundry operation." (R. at 214.)

The Court's consideration of these factors suggests that Plaintiffs should bear more of the costs of response than Defendants; however, the differences here are only slight. Defendants I were fully involved in the transport of the hazardous substances and were also involved in the treatment and/or disposal of the substances. Plaintiffs were fully involved in the disposal and/or treatment of the hazardous substances. Cf. Central Maine Power Co., 838 F.Supp. at 646 (considering two parties' full involvement in generating and arranging for the disposal of waste and other party's full involvement in treatment and disposal of wastes).

### 2. The Ability of the Parties to Distinguish Their Contributions

As the discussion above concerning divisibility indicates, the parties are only able to roughly distinguish their contributions to the contamination of the Site. The parties have

produced few records of shipment of worn journal bearings which indicate Defendant I's contributions. Pneumo Abex also contributed scrap metal purchased on the scrap metal market, to the Site. (R. at 787–88.) The Court has used some of Plaintiffs' volumetric analysis to determine Plaintiffs' Share and Defendants' Share; however, the testimony of Plaintiffs' expert, Dr. Wise, did not include the contribution of lead-bearing materials by Pneumo Abex or Defendants I, individually. The Court has before it no complete volumetric analysis because it refused admission of Remaining Defendants' compilation and Plaintiffs' did not offer theirs. However, Remaining Defendants' expert, Matthew Low, testified that Pneumo Abex contributed approximately 0.9% of the lead-bearing materials at the Site. (*See* R. at 570–71.)

### 3. *Degree of Cooperation with Government Officials*

Response activity at the Site began in 1986. Pneumo Abex has entered into two Consent Decrees, one in 1986 and one in 1996, with the EPA and has been the respondent of one unilateral administrative order issued in 1992 pursuant to § 106(a) of CERCLA. The EPA notified Defendants I on several occasions of their status as PRPs. Finally, on May 6, 1996, approximately two weeks before the trial, the EPA issued to Defendants I a unilateral order pursuant to § 106(a) of CERCLA. Remaining Defendants offered testimony to rebut Plaintiffs' claim that Remaining Defendants had been recalcitrant. Corporate counsel for Norfolk Southern testified that although the EPA sent at least three notices (R. at 488, 490, 491), and a copy of a model consent decree, he viewed the EPA's notifications as "an indication of the agency's jurisdiction under Section 122(a) of CERCLA by which it was renotifying us of the previous special notice waiving the procedures involved in such notice, but inviting further discussion as to our responsibility as EPA has determined it under CERCLA." (R. at 504.) The Court finds that Defendants I's responses to the EPA demonstrate recalcitrance, particularly when considered within the context of the notifications. After identifying Plaintiffs and Defendants I as PRPs and notifying the parties several times of its position, the EPA wrote the following: "By this letter, EPA notifies you of your potential liability with regard to this matter and encourages you to perform or to finance voluntarily those response activities that EPA determines to be necessary at the Site." (Pls.' Ex. 360 at 3.) To date, Remaining Defendants have not performed or financed the performance of any response activities. The letter also included the following: "To further encourage settlement, the EPA is enclosing with this letter a site-specific draft of EPA's model consent decree." (Pls.' Ex. 360 at 4; R. at 504.) Referring to the preceding sentence from the EPA's letter, the corporate counsel testified that he viewed it "as an invitation to negotiate with EPA as to whether and to what extent it deemed or it felt my company might be responsible for the site." (R. at 504–05.) The EPA extended this "invitation" in December of 1994. Norfolk Southern met with the EPA in January of 1995 to discuss the special re-notification. However, the counsel testified that Norfolk Southern did not enter into a consent decree because the "EPA has never otherwise asked us to sign a consent decree." (R. at 507.) The next communication from the EPA to Norfolk Southern was the unilateral administrative order of May 6, 1996. (R. at 508.) Norfolk Southern and CSX Transportation, Inc. met with the EPA on May 17, 1996 to discuss the unilateral administrative order. (R. at 508.) When asked if the parties discussed the consent decree at the meeting of May 17, 1996, the counsel testified as follows: "we focused primarily on the need for additional time to respond to their request. We unequivocally indicated our willingness to comply with the order by Tuesday, May 21, one day after the trial was scheduled to begin, and I believe the subject of a consent decree may have come up, but we asked that those matters be deferred pending completion of the actual trial phase of this case." (R. at 509.) He further testified that he was shocked that the EPA issued the order because he had not heard from the EPA in over a year and he thought that if the EPA were going to issue such an order, it would have provided the parties with an opportunity to discuss their

concerns as it had in the past. (R. at 509.) During this time, Remaining Defendants did nothing to try to resolve its difficulties with the EPA. (R. at 538.) The Court finds Remaining Defendants' rationale wanting. Remaining Defendants knew that the EPA considered them PRPs as early as January of 1993, (R. at 488), approximately three and one-half years ago. Plaintiffs served them with the complaint initiating this action in 1994, approximately two years ago. The Court ruled that Remaining Defendants were liable as generators approximately two months before the trial. Most of the parties found liable in that order have settled with Plaintiffs. Yet, Remaining Defendants persist in their refusal to assist in the cleanup of the Site.

### 4. *Benefits Received From the Contaminating Activities*

Dr. Wise, Plaintiffs' expert, testified that the railroads derived substantial economic benefits from their use of the foundry. (R. at 431.) He further testified that "for the few years in which I can make a direct comparison, the railroads derived a greater benefit from the operation of the foundry than did the foundry.... [I]t was a factor of almost three or four times the benefit to the foundry." (*Id.*) Dr. Wise testified that the railroads benefited from using the foundry because they received a greater credit from their scrap journal bearings than they could have received as payment if they sold the bearings on the scrap market. (R. at 431–32.) He calculated that for the years 1961, 1962, 1964, and 1967 the benefit for the railroads ranged from two (2) cents a pound of scrap journal bearings to nine (9) cents a pound. (R. at 432.) He also calculated that the profit for the foundry was two (2) cents per pound in 1961 and two and one-quarter (2¼) cents per pound in 1962. (R. at 433.) In order to make these calculations, Dr. Wise used the credit price the foundry paid its customer per pound of scrap metal, the amount per pound the foundry paid on the scrap metal market, and information from the American Metal Market to derive a forecasting equation to estimate what the price on the scrap metal market would have been for months for which he did not have data.

(R. at 432.) On cross-examination, Dr. Wise admitted that the foundry derived from its system of conversion the benefit of largely avoiding the scrap metal market. (R. at 460.) However, he testified that the benefit "nets out in their ultimate profits. That would be one reason they would be willing to pay more for this scrap than the scrap dealer...." (*Id.*)

Remaining Defendants presented testimony from Lewis Perl, an economic consultant, to rebut Dr. Wise's testimony about the benefits received by the parties. Mr. Perl testified that he did not think that Dr. Wise's approach made "economic sense." (R. at 840). In essence, he testified that the profits did not change from year to year because a change in the credit price would always accompany a change in the price of a new journal bearing, with the difference between the two prices remaining constant. (R. at 841.) However, Mr. Perl did not testify to specific instances in the years for which Dr. Wise had data that the changes in the two prices always moved proportionally. He provided hypothetical examples but did not point out specifics in the record. (*See* R. at 842–46.) He also criticized Dr. Wise for comparing the scrap market metal price to the conversion price because the scrap metal market represents cash payments and the conversion represents a credit that is not realized until the new journal bearings are purchased. (R. at 847–48.) In effect, Mr. Perl argued, the railroads lent the foundry the value of the scrap bearings without receiving interest. He also testified that Pneumo Abex avoided the volatility of the scrap market which reduced their price of capital, (R. at 848); Dr. Wise similarly testified. (R. at 460.) The Court notes that the railroads would have also enjoyed the benefits of avoiding the volatile scrap market. Mr. Perl also testified that "Dr. Wise makes no allowance for the differential quality of the product, which would all flow to the benefit of Abex and certainly not to the railroads." (R. at 848.) Some of Mr. Perl's testimony supported that of Dr. Wise. For example, Mr. Perl testified that

The reason the scrap price was as low as it was throughout this period is because

Abex chose a high transfer price, which made the scrap market uninteresting. Therefore, the railroads didn't go to the scrap market; they went directly to Abex. Therefore, there was not or at least a lesser demand for the scrap metal. Abex doesn't need to go to them. They can go to the railroads directly.

(R. at 849.) Although the thrust of Mr. Perl's testimony was to give an opinion that the railroads did not receive as great a benefit as Dr. Wise had testified, Mr. Perl himself testified that Pneumo Abex presented the most economically attractive option for the railroads. In response to the Court's questions, Mr. Perl testified that the railroads were "neutral" or indifferent to whether they sold their scrap metal on the market or received a credit from the foundry. (R. at 864.) The Court, however, finds this position incredulous. The railroads maintained this relationship for a significant period of time and the Court finds it unlikely that they were "neutral." Mr. Perl further testified that profits from journal bearings accounted for two and one-half percent of the foundry's profits and that it accounted for six-tenths of a percent of the railroads' profits. (R. at 851.) He reached the figures for the railroads by computing the proportion of the railroads' assets that were represented by the value of the journal bearings. (*Id.*) He reached the figure for the foundry by dividing the profits of the foundry at Portsmouth, as calculated by Dr. Wise, by the total profits for Pneumo Abex. (*Id.*) Mr. Perl only calculated the profits for "five or six railroads," (*id.*), and he did not indicate in his testimony which railroads those were. (*See id.*)

Having reviewed the testimony of the parties' experts and the exhibits, the Court concludes that the benefits received do not sharply distinguish the liability of Plaintiffs versus Defendants. The Court's analysis of the information suggests that both parties profited from the arrangement. They both had an alternative—the scrap metal market—but chose to remain in this relationship for many years. Consequently, the Court finds that this equitable factor militates in favor of finding Plaintiffs and Defendants equally liable for the costs of cleanup.

*.5. Financial Resources of the Parties*

Plaintiffs argue that Remaining Defendants are capable of contributing to the cleanup: "CSX and Norfolk Southern are enormous, billion-dollar companies. Indeed, by every financial measure they have far more resources than Whitman Corporation, not to mention the City and PRHA." (Pls.' Br. at 18.) Citing *United States v. Atlas Minerals & Chems., Inc.*, 41 Env't Rep. Cas. (BNA) 1417, 1480, 1995 WL 510304 (E.D.Pa. 1995), Remaining Defendants argue that the financial resources of the parties are relevant if a PRP is insolvent or unable to absorb a significant portion of the costs. Remaining Defendants also argue that unless a party introduces evidence from which the Court can assess the parties' financial positions, the Court should allocate the shares without regard for financial considerations.

The Court admitted form 10–Ks that Whitman Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company submitted to the Securities and Exchange Commission for the year ending December, 1995. (Pls.' Exs. 246–48.) Whitman Corporation reported assets of $2,363.3 million. (Pls.' Ex. 246.) CSX Transportation reported assets of $10,629 million. (Pls.' Ex. 247.) Norfolk Southern Railway Company reported assets of $10,752.3 million. (Pls.' Ex. 248.) According to the Court's own research, Remaining Defendant Norfolk Southern is a Fortune 500 company and Remaining Defendants CSX Transportation, Inc. and Fruit Growers Express Company, Inc. are subsidiaries or affiliates of CSX Corporation, a Fortune 500 company. Plaintiff Whitman Corporation is also a Fortune 500 company. Plaintiff Pneumo Abex has experienced a number of changes in its corporate structure and affiliations during the last few years. (R. at 365–67.) Thus, the Court is unable to find a measure of its financial health. However, the Court notes that Plaintiffs do not argue that Remaining Defendants' resources are greater than Plaintiff Pneumo Abex's. The Court recognizes that the City and the PRHA have the financial resources characteristic of municipalities; however, Plaintiffs have not suggested that the City or the PRHA is unable to meet its obligations at the

Site. Nothing in the record suggests that any of the parties are unable to pay a share of the costs of cleanup. Thus, this factor also counsels in favor of Plaintiffs and Defendants sharing the liability equally.

Considering these equitable factors, the Court concludes that Plaintiffs' Share of the response costs should be 50% and Defendants' Share should be 50%. As the Court indicated in a separate memorandum opinion and order, the principles of the Uniform Comparative Fault Act govern the effect of settlements and bar of future claims for contribution. Having found that Remaining Defendants are responsible for 80.1% of Defendants' Share, Remaining Defendants are liable for 80.1% of half of the response costs incurred or to be incurred by Plaintiffs for the cleanup of OU1, or approximately 40.1% of the total response costs for OU1.

### E. *Prejudgment Interest*

Plaintiffs also petition the Court for an award of prejudgment interest. Section 107(a) of CERCLA provides for the recovery of interest as follows:

> The amount recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26. For purposes of applying such amendments to interest under this subsection, the term "comparable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences.

CERCLA § 107(a). The Hazardous Substance Superfund ("Superfund") provides that the interest rate for repayment of advances to the Superfund shall be "equal to the current average market yield on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the anticipated period during which the advance will be outstanding and shall be compounded annually." 26 U.S.C. § 9507(d)(3)(c) (1994). Furthermore, the Secretary of the Treasury must invest any portion of the Superfund not required to meet existing obligations and "[s]uch investments may be made only in interest-bearing obligations of the United States." 26 U.S.C. § 9602(b)(1) (1994). The district court in *American Color & Chem. Corp. v. Tenneco Polymers, Inc.,* 918 F.Supp. 945, 960 (D.S.C. 1995), calculated the interest rate "by averaging the auction average annual rate of six (6) month treasury bills and the average annual rate of composite long term government securities" for the years in question. Apparently using this method, Plaintiffs claim that the interest accrued through July 1, 1996 is in excess of $700,000.00. (Pls.' Br. at 22, n. 12.) Plaintiffs, however, do not provide the Court with an affidavit of an accountant or similar expert outlining how they calculated this figure. *Cf. American Color & Chem. Corp.,* 918 F.Supp. at 960.

The Court finds that Plaintiffs are entitled to prejudgment interest and **DIRECTS** Plaintiffs to file the following information with the Court within fifteen (15) days of the date of this memorandum opinion and order:

1) the amount of prejudgment interest claimed based upon the amount of the Court's award in this memorandum opinion and order,

2) the date(s) from which they are calculating the interest,

3) the derivation of the interest rate(s) used, and

4) the per diem rate(s) of interest.

### CONCLUSION

For the reasons stated above, the Court finds as follows:

1) the harm at the Site is indivisible,

2) there exists a rational basis for apportionment of the liability, assigning Remaining Defendants 80.1% of Defendants' Share of 50%, or approximately 40.1% of the total response costs, those incurred and to be incurred,

3) recoverable response costs to date equal $6,829,566.24, and

4) Plaintiffs are entitled to recover from Remaining Defendants prejudgment interest, in an amount to be determined, which continues to accrue until payment.

Plaintiffs are **DIRECTED** to file with the Court the requested information concerning prejudgment interest within fifteen (15) days of the date of this memorandum opinion and order.

The Clerk is **DIRECTED** to send a copy of this order to counsel for Plaintiffs and counsel for Defendants.

It is so **ORDERED.**